ROBERT L. and EILEEN T. BECK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JOHN F. THORNTON, JR., and MAUREEN J. THORNTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Beck v. Commissioner
Docket Nos. 24153-84; 28832-84.
United States Tax Court
T.C. Memo 1987-359; 1987 Tax Ct. Memo LEXIS 359; 53 T.C.M. (CCH) 1406; T.C.M. (RIA) 87359; July 22, 1987. *359 Held: The benefits and burdens of ownership of units of cattle did not pass to petitioners in the year of purported acquisition. Held further, alleged indebtedness was not genuine since neither debtor nor creditor intended it to be paid. William E. Frantz, D. Robert Autrey, Jr., Donald B. DeLoach, for the petitioners. *360 Todd K. Snyder and Albert Sandlin, for the respondent. WHITAKER
WHITAKER, Judge: Respondent determined a deficiency in the Federal income tax liability of petitioners Beck (docket No. 24153-84) for their 1980 calendar year in the amount of $ 21,923.35. Respondent determined a deficiency in the amount of $ 32,283 and an addition to tax under section 6651(a)(1) [1] in the amount of $ 3,806 against petitioners Thornton (docket No. 28832-84) for their calendar year 1980. After concessions by petitioners Thornton, the sole issue in each of these dockets arises out of the tax consequences flowing to each set of petitioners by reason of the alleged purchases by Mr. Beck and by Mr. Thornton respectively of cattle from Double C Hereford Ranch, Inc. (Ranch) in December 1980. [2] The two dockets were consolidated for purposes of trial, briefing, and opinion. *361 FINDING OF FACT Some of the facts have been stipulated and they are so found. [3] On July 9, 1984, on which date the petition in docket No. 24153-84 was filed, petitioners Beck resided in Spring Lake, New Jersey. On August 13, 1984, the date on which the petition in docket No. 28832-84 was filed, petitioners Thornton resided in Bay Village, Ohio. During all of the taxable year 1980 and for periods of time before and after that year, Mr. Beck (Beck) and Mr. Thornton (Thornton) were each employed by Datapoint Corporation. In 1980, and for some period of time before that, Thornton, who is a college graduate, was regional manager with offices in Atlanta, Georgia, for a Datapoint region which included North and South Carolina. In 1980, Beck was a senior marketing representative for Datapoint in the Northeast region. During 1980, Thornton received in compensation from Datapoint almost $ 100,000 and Beck over $ 180,000. *362 The Ranch during the years involved was owned by two individuals -- Charles E. Croom, Jr. and Charles Aycock. Croom owned 85 percent of the outstanding stock of the corporation and Aycock the remainder. The principal place of business of the Ranch was Lancaster, South Carolina. In 1980 Croom was the president, his wife secretary-treasurer, and Aycock, vice president. Croom attended college but did not receive a degree, studying engineering and computers. From 1975 until sometime in either 1978 or 1979, Croom was employed full time by Honeywell Corporation. In 1978 or 1979 he was recruited by Thornton to work for Datapoint as a branch manager. Over time he was promoted by Datapoint to more responsible positions and at some point subsequent to 1980 he left San Antonio, Texas, where he was then based and returned to the Carolinas to work on a part-time basis. Thereafter he formed his own computer business. Apparently, at no time prior to trial has Croom ever devoted full time to his cattle business. In 1975, Croom acquired a small ranch presumably in South Carolina, consisting of about 47 acres. [4] By 1978 Croom's property had increased to 147 acres. Croom started with *363 a 13-animal herd of commercial cattle in 1975 which had increased to 200 head by 1980. Croom and his family lived on the property. The work with respect to the cattle was handled by Croom on weekends and by his wife and children, and at some point in or prior to 1980, by two outside employees and two consultants. There was in addition one full-time person helping with the cattle. [5]
*364 Croom's ambition, developed before or during 1975, was to become a successful cattle rancher with one or more championship animals. He realized, however, that individually he could not finance this ambition, and therefore would need funds from outside sources. His initial concept in 1975 was to buy one or more cows for an investor, charge the investor for the cost of raising, breeding, and managing the cows, keeping some of the offspring as his profit. That concept was proven to be unsound since the cost of raising cows exceeds the profit potential. In 1978, Croom engaged the accounting firm of Price Waterhouse to formulate a program which was finally put into effect in 1980 with the help of various advisors including an Atlanta attorney by the name of D. Robert Autrey, Jr. who prepared the necessary documents. The concept provided for "sale" of herds to investors, each herd or unit consisting of 10 cows and 3 bulls. [6] The objective was to improve each herd so that at the end of a 7-year program period[7] the investor would own a herd of greatly improved and arguably more valuable animals. Croom continued to hope that either the Ranch or the herd of one or more of the investors *365 would end up with a National Championship animal. Improvement of the herd was to be accomplished by gradually culling and replacing the animals in the original herds with higher quality cows either through breeding and raising quality calves or through purchase of better quality cows or heifers. Prior to December 1980, Croom had started to upgrade the cattle owned by the Ranch from commercial cattle to registered horned Hereford cattle. However, during 1980 he became convinced that registered polled Hereford cattle would be a better investment. [8]
Thornton met Croom during the year 1978 in connection with efforts by Thornton to recruit a branch manager for the DatapointCarolina branch. That branch covered both North and South Carolina. It was headquartered in *366 Charlotte, North Carolina. During the course of conversations with Croom, Croom's cattle ranch and his plans therefor were discussed. Close to the time that Croom went to work for Datapoint, Thornton visited Croom at his home, seeing the cattle operation for the first time. This contact with Croom led to the sale to Thornton by Croom prior to 1980 of a few commercial cows or calves to be raised on the Ranch for sale for beef. Thornton's venture approximately broke even. He was aware at that time that Croom wanted to go into the cattle business full time, that Croom's cattle business up to that point had not been profitable, but that Croom felt that by raising purebred Hereford registered cattle, the business could be profitable. By December 1980 Croom's hopes and objectives had been communicated to Thornton. At some point, probably in 1979, Croom and Beck met. In December and either on or as of December 15, 1980, Thornton purchased two herds, each consisting of 10 cows and 3 bulls while Beck purchased one herd. The purchase price of each herd was $ 100,000 payable in two parts, $ 2,025 in cash, and $ 97,975 evidenced by a note payable in two installments, $ 66,140 on or before *367 7 years and $ 31,835 on or before 8 years from the date of the purchase. The note provided for interest at the rate of 8-1/2 percent payable quarterly commencing on March 15, 1981. The program documents [9] consist of the basic agreement, dated December 15, 1980, and described simply as "Agreement." It provides for the purchase of one unit of cattle, grants to the Ranch a purchase money security interest in the herd until the note is paid, and includes a warranty that all cows are breeders. The Agreement obligates the Ranch to breed the cows each year or more often with the three bulls. The Ranch is obligated to take (i.e., retain) possession of all of the cattle, and to provide a professional breeding program, the necessary land, feed, maintenance of the cattle in good health and other customary services, for all of which the investor agrees to pay $ 350 per year per animal for the 7-year term. The Agreement recites that the Ranch and the investor have entered into a separate option for the sale of the calves produced by the herd. Breeding rights in the three bulls are granted to the Ranch for the 7-year term without payment except that the investor receives a credit against the *368 maintenance cost of the bulls of $ 149.38 per animal per year. The Agreement specifies that the investor will pay the Ranch the aggregate sums for maintenance of the herd of $ 15,256 on or before 7 years, and $ 3,000 on or before 8 years from the date of the Agreement or an aggregate of $ 18,256 for maintenance. [10] The Agreement recognizes that the cattle will be mixed with other cattle although each investor's herd is to be identified by ear tags and tattoos. The Ranch agrees to replace cows becoming ill or dying with cattle of approximately the same quality and age. The Ranch is given absolute discretion in the maintenance of the cattle. Some other fees are specified in the Agreement, and the investor is required to carry insurance on the cattle in the amount of the purchase price. There is no evidence that either Beck or Thornton ever procured insurance. *369 In an unusual provision the Agreement states that the purchase price of the herd will be reduced if as result of audit by the Internal Revenue Service an adjustment is made in the value of a unit as of the date of purchase. But notwithstanding any reduction in the purchase price and therefore in the amount of the promissory note, the annual interest specified in the note amounting to $ 8,328 remains fixed, the interest rate simply escalating to the amount necessary to produce that annual interest charge. The sum of $ 8,328 per herd was intended to provide a uniform cash flow to the Ranch over the 7-year period. The 8-1/2 percent interest rate was apparently computed by Autrey to provide the specified annual payment. The related promissory note appears to be in reasonably standard form. The security agreement gives to the Ranch a security title to each of the original herd as well as to replacement cattle until the promissory note is paid in full. The bill of sale is expressly made subject to the security agreement. It provides that at the time the security interest is satisfied, clear title to the cattle will be conveyed to the investor. The second principal document *370 is the Option Agreement. It recites that "WHEREAS, the offspring of the Investor's cattle, hereinafter referred to as 'Calves,' are desirous of being purchased by the Rancher and the Investor is desirous of selling the calves." A yearly option to sell to the Ranch is granted to the investor to purchase all of the calves born to the investor's herd up to nine calves each year, the purchase to be effected as the calves reach the age of 24 months. The option is for a period of 7 years commencing 24 months from the date of the Agreement and thus terminating 24 months after the end of the 7-year term. Irrespective of the actual number of calves (up to nine) born each year or the actual value of any and all calves, the Ranch will pay the fixed annual sum of $ 15,825. If more than nine calves are born to the investor's herd, the Ranch will purchase the additional calves at the fixed price of $ 1,750 per calf, less accrued maintenance charges, provided the investor wishes to sell the extra calves to the Ranch. Payment of the purchase price for the calves (whether none or up to nine) each year is $ 100 in cash and a promissory note in the amount of $ 15,725 with interest at 6 percent payable *371 according to an attached schedule. The schedule reflects that payment for the first five calf crops is due on December 15, 1988. Title to the calves passes to the Ranch at the time the notes are executed and in addition the Ranch is given a security interest in the calves from the dates of birth as additional security for the original deferred purchase price of the herd. The Ranch has the authority to breed or dispose of the calves and the offspring of the calves even though the promissory notes given by the Ranch for their purchase price have not been paid. The Option Agreement also includes a provision for adjustment of the purchase price of the calves as a result of Internal Revenue Service adjustments to the value of the cattle, paralleling the similar provision in the Agreement. No mechanics for exercise of the option are set forth. Since as we find purchase of each year's total calf crop throughout the 7-year program by the Ranch was agreed upon by the parties in advance, mechanics for the option's exercise apparently were unnecessary. [11]
*372 Assuming no adjustments in the purchase price, an individual acquiring one unit in 1980, that is, 10 calves and three bulls, will in 1987 and 1988 receive the aggregate sum of $ 128,998, reflecting the agreed price of the seven annual calf crops plus interest, assuming no more than 9 calves are born each year. By coincidence, the aggregate maintenance charges payable by each investor in 1987 and 1988 plus the principal due on the investor's promissory note aggregates $ 116,231. If the final two installments of interest, $ 8,328 for 1987 and $ 2,705 for 1988, are added to the deferred maintenance and the deferred purchase price, the investor would owe the Ranch a total of $ 127,264 by December 15, 1988. Of course, the investor would have also paid almost $ 50,000 in interest over the prior 6-year period, plus the small initial cash payment, together with various other fees and expenses. The Beck agreements, copies of which are stipulated, have attached a list of the initial herd described by ear tag and tattoo numbers. The original Thornton Agreements were not located bu the parties stipulated that they were identical in verbiage to the Beck agreements. Thornton simply signed *373 two sets of identical documents instead of one since Thornton purchased two units. [12] The Agreement specifically refers to the Promissory Note which was attached as an exhibit to the Agreement. The Security Agreement appears also to have been attached as an exhibit to the Agreement. The Agreement and the Option Agreement refer specifically to each other. Each of these several documents constitute related parts of a single transaction. The documents reflect, the testimony confirms, and we find as a fact that it was the actual agreement of both the Ranch and Beck and Thornton that the identification of animals in the contracts was meaningless since some or all of their animals were expected to be culled and replaced with higher quality animals during the 7-year program period; that the cattle were to be managed *374 by the Ranch; and more specifically under Croom's direction in the complete discretion of the latter, that during the term of the Option Agreement all calves were to be purchased by the Ranch and that the investors were simply looking to the end of the 7-year breeding program at which point in time they expected to own, without further material payment, an improved herd which each of them could then sell or keep as each saw fit to do. There was no intent or expectation that either Beck or Thornton would exercise his privilege of keeping any calves or of taking possession of his herd or herds until the end of the program. Neither Beck nor Thornton had any personal expertise in raising cattle, any facilities with which to do so, or any desire to become cattlemen. Neither person secured any independent advice from knowledgeable sources about the proposed investment or as to Croom's expertise. Beck did check with his tax advisor but there is no indicating that the latter had knowledge of the cattle business or was capable of projecting or attempted to project the profit potential of the investment. Up to the date of trial neither Beck nor Thornton attempted to participate in any management *375 decision with respect to their herds and on December 15, 1980, and at all times thereafter neither individual had any intent or expectation of exercising management powers during the term of the program. Neither Beck nor Thornton in December 1980 was concerned as to the quality or breed of the animals in their herds or their values or costs to the Ranch. However, through the date of trial both Beck and Thornton have remained current in their payments to the Ranch. Neither Beck nor Thornton knew anything about the breeding or age of the cows assigned to each of their respective herds or more specifically whether they comprised horned Herefords or polled Herefords or a mixture or neither. Most of the cattle assigned to each of the three herds were actually owned by the Ranch (or perhaps by Cattle Enterprises, Inc.) at the time the 1980 contracts were executed. None of the original Beck or Thornton cattle were "show quality animals." The cost of the original cows in the three herds varied from about $ 1,200 to $ 1,500 per head. The parties have stipulated that in 1980 the value of each animal in each of the three herds was $ 1,250. The purchase price for each unit of $ 100,000 *376 had no relation to the actual value of the cattle in 1980. The purchase price was intended to cover the cost of the 10 cows over the 7-year program, costs to promote and to breed the cows, to show them and the calves, and to carry out all of the other responsibilities and obligations of the cattle program, including the cost of the land and equipment. The actual cost or fair market value of components of each herd had little to do with fixing the purchase price. Cattle in the herds which were registered either with the Horned Hereford Association or the Polled Hereford Association. On the records of those two organizations, the owner of the registered cattle was shown as the Ranch, hence neither Beck nor Thornton could have transferred any of the registered cattle without action by the Ranch to effect a change in the registration from it to Beck or Thornton. Petitioners and their counsel contended during the trial that at the end of the 7-year period Beck and Thornton would not only be entitled to their 10 heifers or cows and their undivided interests in a bull [13] but also to the last 2 calf crops, apparently those calves born during the fiscal years which ended on December 15, 1986, and *377 on December 15, 1987. However, the Option and the substituted Calf Option Agreement provide to the contrary. See n. 11, supra. On the basis of the 1980 documents at termination of the Agreement on December 15, 1987, Beck would have been titled to 10 cows or heifers and Thornton to 20 cows or heifers. Beck and Thornton must have understood that by the end of the program the deferred purchase price of their herds would have been paid so that they could take possession of their herds without additional substantial out-of-pocket cost. In 1982, in order to permit the substitution of an undivided interest in a single bull for the three bulls comprising each herd and to make express the obligations to cull and replace animals from each herd, Croom through the Ranch caused amended documents to be prepared and submitted to the investors for execution. On March 7, 1982, Thornton and the Ranch executed two complete sets of substitute documents. On April 10, 1982, Beck and the Ranch executed one set of identical documents. Each of *378 the 1982 agreements purports to be effective as of the date of the original agreements. [14] Material differences appear only in the Cattle Breeding Agreement and the Calf Option Agreement which replaced respectively the Agreement and the Option Agreement. The Cattle Breeding Agreement gives the Ranch the right to substitute an undivided interest in "an extremely high quality bull" for the three bulls contained in each original herd and the right to cull cattle from the original herd, replacing them with other animals of "equal or higher quality." [15] The ear tag and tattoo numbers of the original 10 cows in the Beck herd are the same as the 1980 document but each cow is described *379 as a "registered polled Hereford cow." The substitute promissory note in the same principal amount is payable in three installments on the 7th, 8th, and 9th years from the date of the note in place of two installments as set out in the 1980 note. The two security agreements are essentially the same as are the two bills of sale. The Calf Option Agreement differs in at least one material respect. The annual purchase price of the calf crop is increased from $ 15,825 to $ 18,825 or an aggregate including accrued interest of almost $ 144,000. The option mechanics established by the 1982 agreement call for the Ranch to notify the investor of the fiscal cow/calf status, that is for each cow various statistics with respect to that year's calf. If the investor fails to notify the Ranch of his desire "not to sell the fiscal year calf crop" within 30 days after notification of the cow/calf status, the investor is deemed to be exercising the option to sell the fiscal year calf crop. The schedule attached to the Calf Option Agreement shows that calves born during the fiscal year expiring November 30, 1987, the last year of the restated term of the agreements, are subject to purchase by note *380 due on November 30, 1989. Under these substitute agreements, neither Beck nor Thornton is entitled to any calves upon expiration of the 7-year term of the program unless each of them affirmatively acts to terminate the Calf Option Agreement. Should they elect to do so as to calves born during the last two fiscal years of the term of the program, their payment from the Ranch would be reduced from $ 143,769 to $ 106,119 against the deferred obligations for the purchase price and maintenance charges totaling $ 129,825. We conclude that the understanding, intent, and actual agreement between Beck and Thornton on the one hand, and the Ranch/Croom on the other under the Calf Option Agreement did not change or differ from that under the 1980 Option Agreement. Thus it remained a term of the transaction that the Ranch would purchase every calf born during the entire 7-year term. The focus of the 1980 breeding program was at least in part to maximize each year's *381 calf crop and the Ranch commenced replacing nonbreeders in each of the three herds in 1981 and 1982. The breeding program was, however, gradually changed to emphasize the use of genetics to improve the caliber of the offspring of the cows and gradually to substitute higher quality cows for the cows in each herd so that by the end of the 7-year program the quality of each herd would be substantially improved. [16] Croom and his staff exercised complete discretion in replacement of cattle in each herd, making an effort to maintain approximate equal values in all herds. As a result of the program, at the time of trial one of the cows which was a replacement for one of Beck's original cows had become a gold trophy dam [17] and three of Thornton's cows were of unusually high quality. *382 During the period from December 15, 1980, to the trial, the Ranch [18] participated in many cattle or calf shows with some success. At the time of trial there were on the property utilized by the Ranch and by Cattle Enterprises, Inc., approximately 800 breeding age cows or heifers, at least most of which were registered cattle. Thus Croom's operation has grown to a significance size with professionally qualified management. This was not true of the operation in December 1980. [19]
OPINION As an initial matter, we think it will be helpful to determine what effect, if any, we can give in this case to the 1982 amended agreements. Petitioners argue, based on state law, that the amended agreements are controlling since they specifically replaced the 1980 agreements. Respondent on the other hand would have us ignore the 1982 agreements, *383 arguing that, as to the year 1980, which is the only year before us, we can only consider the original agreements. In support of his position, respondent refers us to Fono v. Commissioner,79 T.C. 680 (1982), affd. without published opinion 749 F.2d 37 (9th Cir. 1984), among other authorities. In Fono at 695 we held: The courts have not looked with favor upon retroactive revisions of written instruments, or even State court decrees, as a ground for determining tax liabilities. In Van Den Wymelenberg v. United States,397 F.2d 443, 445 (7th Cir. 1968), where the parties executed an amended trust agreement to support their claim to a gift tax exclusion under section 2503(c), the court explained: As to the parties to the reformed instrument the reformation relates back to the date of the original instrument, but it does not affect the rights acquired by non-parties, including the Government. Were the law otherwise there would exist considerable opportunity for "collusive" state court actions having the sole purpose of reducing federal tax liabilities. Furthermore, federal tax liabilities would remain unsettled for years after *384 their assessment if state courts and private persons were empowered to retroactively affect the tax consequences of completed transactions and completed tax years.
We agree with respondent, that, to the extent that the 1982 agreements made material changes in the contract obligations and benefits of the parties, we cannot decide the 1980 tax liability of either set of petitioners on the basis of the 1982 documents. However, to the extent that the 1980 agreements are ambiguous, and they certainly are, the 1982 agreements may be considered by us. We also recognize that the 1980 transaction may have included oral representation or understandings such as culling and replacing the cows and a firm agreement to sell and purchase all calves. The fact that the documents purported to disaffirm such side agreements is immaterial. The 1982 documents in part confirm the oral terms. There is, however, no need to discuss this matter further since we reach the same disposition of the issue whether we consider only the 1980 agreements or the 1982 agreements. In this case, Beck and Thornton each paid $ 100,000 per unit for their initial herds. Petitioners contend that they purchased cattle *385 in 1980, that a bona fide sale took place at that time and that the difference between the total purchase price and the stipulated value of the cattle, $ 1,250 per animal, is referable to valuable intangible rights in the program which petitioners are entitled to amortize over the 7-year term. Respondent's principal position is that no bona fide sale took place in 1980 since the transaction lacked economic substance and the benefits and burdens of ownership remained with the Ranch. Respondent argues that the obligations reflected by the promissory notes are illusory, that the transactions were mere shams motivated solely by tax considerations and bereft of any business purpose. The word "sham" is almost invariable utilized by respondent in describing tax shelter investments and it has gradually acquired a number of different meanings, or shades of meanings, which make it almost useless verbiage. In such case, there is no doubt that real live cattle were owned by the Ranch and allocated to each of the three units assigned respectively to Beck and to Thronton, that real contracts were entered into between the parties in December 1980 and amended or substituted contracts entered into *386 in 1982 and that there was performance under these contracts both by Thornton and Beck on the one hand and by the Ranch and its principal Croom on the other hand. In this respect, these transactions were not shams. Basically we agree with respondent that petitioners did not buy cattle in 1980 and that the notes did not create bona fide indebtedness, but for different reasons. We do not think it will serve any useful purpose to consider either party's arguments as to profit motive or as to the acquisition of tax benefits or the enormous discrepancy between the actual value of the cattle and the purchase price. Neither are we required to focus on the economic substance of the transactions or apply the doctrine of "substance over form." We simply conclude that the benefits and burdens of ownership of cattle did not pass to Beck or Thornton in 1980. They acquired in 1980 the right to future ownership of a herd of 10 female animals and an undivided interest in one bull, to ripen into possession upon termination of the 7-year term on December 15, 1987, or November 30, 1987. As of the date of the initial contracts on December 15, 1980, petitioners did not acquire legal or equitable *387 title to any specifically identified animal. Their contract right was to ownership of animals to be identified in the Ranch's discretion at the end of the 7-year term. Under Georgia law which governs the transactioons, Goods must be both existing and identified before any interest in them can pass. Goods which are not both existing and identified are "future" goods. A purported present sale of future goods or of any interest therein operates as a contract to sell. [Ga. Code Ann. sec. 11-2-105(2) (1982).]
Federal tax law does not convert a contract to sell into a contract of sale. In Frank Lyon Co. v. United States,435 U.S. 561 (1978), the Supreme Court reiterated the principle established many years ago that taxation is less concerned with the location of bare legal title than with the "actual command" over the property involved. 435 U.S. at 573. We look at the transaction as reflected in the set of documents executed by the parties of which the Agreement or Cattle Breeding Agreement and the Option or Calf Option Agreement are the critical documents since together they establish all of the important obligations *388 and privileges of each of the parties. The bills of sale are essentially meaningless. Whether or not they actually vested legal title in either Beck or Thornton in view of the simultaneously executed security agreement which appears to revest legal title in the Ranch, is unclear as well as immaterial. The arrangements were structured so that the Ranch which initially owned or acquired full title to each of the animals could continue to operate as though it still had full title to each animal. [20] The promissory notes were illusory, creating no real obligation, and may essentially be ignored. Croom was a forthright and thoroughly credible witness, especially in describing his goal to establish a quality herd of registered polled Hereford cattle and to breed at least one national champion. As he stated, he did not himself have the money to pursue this goal and therefore he looked around for a source of funds, which with the benefit of anticipated tax deductions, he *389 was able to obtain from Beck, Thornton, and other investors. We agree with respondent that without the current tax benefits, it is more than likely that neither Beck or Thornton would have been willing to make the so-called down payment on the purchase price and then to provide the Ranch with the cash flow which Croom required in order to pursue his goal. The documents provided and the parties understood and agreed that the Ranch had and would for 7 years retain "actual command" over the herds. Analysis of the transactions is facilitated by considering separately petitioners' contentions that a present sale of each unit of cattle to Beck and Thornton occurred on December 15, 1980, at the fair market value for each animal of approximately $ 1,250 apiece and that the balance of the purchase price of $ 100,000 was paid for the intangible rights reflected in the Agreement and the Option. A sale is a transfer of property for a fixed price payable in money. Commissioner v. Brown,380 U.S. 563, 570 (1965); Smith v. Commissioner,    F.2d    (11th Cir. 1987), affg. a Memorandum Opinion of this Court. A sale is deemed to have occurred for Federal tax purposes *390 upon the transfer of the benefits and burdens of ownership rather than upon the satisfaction of technical requirements for the passage of title under state law. Grodt & McKay Reaty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981). The question of whether the benefits and burdens of ownership have been transferred is essentially one of fact "which must be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attending facts and circumstances." Grodt & McKay Realty, Inc. v. Commissioner, supra; see also Smith v. Commissioner, supra.Factors which have been considered in determining whether or not a sale has occurred are: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the properety taxes; (7) which party bears the risk of lost or damage to the property; (8) which *391 party receives the profits from the operation and sale of the property. [Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237-1238.]
See also Houchins v. Commissioner,79 T.C. 570, 591 (1982); Hunter v. Commissioner,T.C. Memo. 1982-126; Siegel v. Commissioner,T.C. Memo. 1985-441. Applying the factors listed in Grodt & McKay, it is at least doubtful that effective legal title was transferred to Beck and Thornton on December 15, 1980, as we have already recognized. While the bill of sale purports to transfer legal title, the security agreement takes it back again. There appears to be no provision for any registration or recoding of title to cattle under either South Carolina or Georgia law. The most closely analogous registration for pure bred cattle is with the appropriate association either the Horned Hereford Association or the Polled Hereford Association. To the extent that any of the cattle in any of these three herds were registered, registration showed the Ranch or possibly Cattle Enterprises, Inc. as the owner. Moreover, the actual contract between the parties, that is the written *392 documents as amplified by the oral understandings demonstrate that the particular cattle identified in the Agreement were not intended to be the cattle to be delivered to Beck or Thornton at the termination of the 7-year program. At best, the transaction was an agreement to sell and purchase cattle at the end of the program. The actual animals subject to this future sale were not identified in 1980. For a present sale to occur under Georgia law, the property must be presently identified or identifiable. As a result, we find that there was no present transfer of title to the property intended to be sold in the future. And as our discussion has already indicated, the parties actually treated this transaction not as a present sale but as a future sale of property to be identified and selected by the Ranch at the expiration of the 7-year program. By the same token it cannot be said that in 1980 either Beck or Thornton acquired any equity in the units of cattle purported to be allocated to each of their three contracts. As to the fourth factor, the documents themselves as well as the overall understanding of the parties demonstrates that there was no present obligation on the seller *393 to execute and deliver a deed. That event was to take place, if at all, at the expiration of the 7-year term and only if at that point either Beck or Thornton elected to take possession of the cattle then constituting their herds as opposed to disposing of the cattle through the Ranch. The fact that both Beck and Thornton agreed to and did make annual payments providing the Ranch with the necessary cash flow, does not alter this result. As to possession, there was never any intent for possession to be transferred to Beck or Thornton until the end of the 7-year term. Complete and full possession and control of the cattle remain at all times in the Ranch during the 7-year period. There is nothing in this record to indicate whether or not property taxes were paid on the cattle but if any such taxes were paid, they certainly were paid by the Ranch, not by Beck or Thornton. Neither Beck nor Thornton held any risk of loss or damage to any of the cattle during the 7-year period. That risk was solely on the Ranch, notwithstanding the purported provision for insurance in the 1980 contracts which was never implemented. Further, during the entire 7-year period, the entire profits from the *394 sale of cattle, both the calf crops and the proceeds from sales of culled animals, belonged to the Ranch. It was not until the expiration of the 7 years that Beck or Thornton had any expectation of receiving any profit from disposition of the cattle then constituting their respective herds. As we said in Grodt and McKay,77 T.C. at 1238, "[u]sing the above criteria as guideposts, we conclude that [the Ranch] did not sell the cattle to petitioners." Disposition of petitioners' contentions that they purchased in 1980 a bundle of intangible rights for the difference between the value of the cattle and the sum of $ 100,000 requires little discussion. The so-called promissory notes were illusory. As we have found, there was never intention on the part of any of the parties that these notes would be paid by Beck or Thornton. On the contrary, the transactions were skillfully arranged so that the purported obligations of each party would be substantially offset at the end of the term, the fictitious purchase price for calves approximately matching the purported deferred obligations for the payment of maintenance fees and purchase price of cattle. All that Beck and *395 Thornton acquired with their out-of-pocket payments of cash was a combination of anticipated tax benefits and installment payments in an indeterminate amount for units of cattle to be in existence and identified at the end of the 7-year program. There is no way in this record for us to distinguish between the cost of the tax benefits and the purchase price of the herds to be acquired in 1987. The determination of petitioners' cost basis in their herds when, as, and if they take possession of them in 1987 or then cause the Ranch to sell the herds is not a matter before this Court. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. By amendment to the petition filed on June 12, 1985, each of petitioners Beck and Thornton alleged that they were denied equal protection of the laws since they were not treated similarly to other taxpayers who allegedly purchased cattle from the Ranch and that respondent through one of its agents made an agreement that taxpayers similarly situated who allegedly purchased similar units of cattle would be similarly treated. The record in this case was held open to allow the filing of a third supplemental stipulation which would have identified all of the other similarly situated taxpayers known to petitioners or to respondent. During the trial, petitioners were informed by the Court that there was probably no merit to this issue but the Court would allow petitioners to raise it, nevertheless. However, the third supplemental stipulation has never been filed and petitioners have not argued this issue in any of their briefs. Accordingly, we deem this issue to have been conceded by petitioners. In this connection, we note that the Court's files do not reflect that respondent's amended answer was refiled as his answer to the second amendment↩ to the petition. This was inadvertent and we treat respondent's amended answer as having been refiled on June 12, 1985, in each of said dockets. 3. In our Findings of Fact and Opinion we may for convenience use, as the parties have done in the stipulations, words such as "sale," "sold," "owned," "owner," "ownership", "purchase," "acquire," "investor," and other like words in order to describe the transactions which took place and the documents which the parties have executed but without intending any inference by the use of such words as to the tax consequences of any aspect of the transactions. ↩
4. We assume this property was located in or near Lancaster, South Carolina. ↩
5. We do not know when the Ranch was incorporated. Title to the land was not transferred to it. Whether Croom leased land owned by him to the Ranch or simply allowed the Ranch to use it is not clear. The parties have treated the Ranch as the entity from which units of cattle were acquired and by which the cattle were managed. Croom also apparently owned in whole or in part another corporation, Cattle Enterprises, Inc., which offered investment programs similar to the Double C Hereford Cattle Programs. For purposes of this record we will treat Croom and Aycock collectively as alter egos of the Ranch and of Cattle Enterprises, Inc., the individuals and the two corporations collectively being engaged in essentially a single business, which insofar as these petitioners are concerned we will assume was operated by the Ranch with Croom as the predominate manager and policymaker. There appears to have been only a single ranching business using land located in and around Lancaster, South Carolina, partly owned by Croom and partly leased from third parties. By the time of trial approximately 1,300 acres were owned out of a total of about 5,000 acres used in the business. ↩
6. A person with elementary knowledge of breeding cattle, which Croom must have had by 1980, would know that a single bull could service more than 10 cows. No one explained the purpose, if any, served by three bulls. ↩
7. We do not know the basis for selecting 7 years as the program period. ↩
8. Registered Hereford cattle may be either "horned" or "polled," that is bred without horns. Each type is a distinct breed. ↩
9. Only those provisions deemed relevant to the issues are summarized. Substitute documents, described later on in our opinion, were executed in 1982. ↩
10. It is unclear how this sum was determined since the cost of maintaining 10 cows for 7 years at $ 350 per cow would be $ 24,500 and the cost of 3 bulls at $ 200.62 each, an additional $ 4,213. ↩
11. The Option Agreement is ambiguous. It provides that the ranch will purchase "yearly" the calves "as each calf reaches twenty-four (24) months" from December 15, 1980. The notes evidencing the calf purchase price bear interest at 6 percent per annum. The schedule attached as an exhibit to the Option Agreement reads as follows: ANNUAL
APPROXIMATE
APPROXIMATE
CALF CROP
DUE DATE
PRINCIPAL
INTEREST
TOTAL P & I
1982
12-15-87
$ 15,725
$ 5,318
$ 21,043
1983
12-15-87
$ 15,725
$ 4,127
19,852  1984
12-15-87
$ 15,725
3,004
18,729  1985
12-15-87
$ 15,725
1,944
17,669  1986
12-15-87
$ 15,725
943
16,668  1987
12-15-88
$ 15,725
1,944
17,669  1988
12-15-88
$ 15,725
943
16,668  This schedule confirms that seven calf crops are to be purchased. By using the amount of each interest payment we calculate the date of each note to be as follows: Annual Calf Crop
Note
1982
12/15/82
1983
12/15/83
1984
12/15/84
1985
12/15/85
1986
12/15/86
1987
12/15/86
1988
12/15/87
The only calves available for purchase on December 15, 1982, would be those born during the prior two fiscal years, fiscal year 1981 and fiscal year 1982. The only calves which could reach 24months on December 15, 1982, would have been those born on December 15, 1980. Each note must, therefore, represent the purchase price for those calves which pass 24 months of age during the next succeeding fiscal year, that is, those born during the period December 16, 1980, through December 15, 1981, which is the 1981 fiscal year. The last calf crop to which the exhibit refers includes those calves born during the final fiscal year of the program. We note that this interpretation is consistent with the more detailed and specific language of the similar exhibit attached to the 1982 Calf Option Agreement, which was entered into and became binding on the parties prior to the date prescribed in the 1980 Option Agreement for execution of the first note. ↩
12. Respondent complained loudly during the trial because the ear tag and tattoo numbers of the original Thornton herds initially furnished by petitioners to respondent were in error, since a number of replacement animals were included. Except that it reflects poor record keeping on the part of both Thornton and the Ranch, we deem this confusion to be immaterial. ↩
13. Subsequent to the purchase of the herds by Beck and Thornton, an undivided interest in a bull was substituted for the three bulls in each unit. ↩
14. Although the Beck and Thornton 1980 agreements are dated December 15, 12980, the 1982 agreements recite that the earlier agreements were entered into "on or about December 1, 1980." Thus the fiscal year for the 1982 substitute agreements runs from December 1 though November 30 whereas the fiscal year of the 1980 agreements was treated as expiring on December 15 of each year, although it should have actually expired on December 14, 1980. This discrepancy between the two sets of documents is immaterial. ↩
15. Authority is also given to cull calves with any revenue received from the calf culling to be retained by the Ranch, but this is immaterial in view of the actual agreement that all calves were to be property of the Ranch. ↩
16. In later years embryo transfer may have been considered. Use of that technique minimizes the importance in the herd of the lineage of cows but maximizes the importance of the ability to accept the transfer and produce a sound calf. ↩
17. For a registered polled Hereford cow to become a "gold trophy dam," the offspring of the cow must receive a total of 35 points in shows sponsored by the American Polled Hereford Association. This cow was not a gold trophy dam when it was assigned to Beck's herd. ↩
18. See n. 5, supra.↩
19. Petitioners contend and Croom and his professional ranch manager testified that the Ranch was the largest registered polled Hereford ranch in the United States with national recognition. There was conflicting testimony and no corroborating disinterested evidence. Hence we make no fact finding in this regard. ↩
20. Without the cooperation of the Ranch in executing other documents, neither Beck nor Thornton had any power to take control of any cattle or dispose of any cattle without payment in full of purchase price. ↩