RALPH CHERIN, PETITIONER v. COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 7034-84.          Filed November 23, 1987.

*Judith A. Frankel,* for the petitioner.
*Avery B. Cousins III,* for the respondent.

WHITAKER, *Judge:* Respondent determined deficiencies in
petitioner's Federal income tax for the years and in the
amounts as follows:

| Years | Amount |
| --- | --- |
| 1972 | $27,425 |
| 1973 | 18,905 |
| 1974 | 13,191 |
| 1975 | 2,740 |
| 1976 | 1,586 |
| 1977 | 185 |
| 1978 | 1,416 |

By amendment to the answer, respondent asserts that the
deficiencies constitute substantial underpayments attribut-
able to tax-motivated transactions within the meaning of
section 6621(c),[1] formerly section 6621(d). The issues for
decision all arise out of petitioner's investment in a cattle
program operated and offered by Southern Star Land &
Cattle Co., Inc. (Southern Star).[2] Petitioner's investments
were made in June 1971 and January 1972. This same cattle
shelter has been the subject of three memorandum opinions
of this Court: *Hunter v. Commissioner,* T.C. Memo.
1982-126; *Siegel v. Commissioner,* T.C. Memo. 1985-441; and

---

[1]All section references are to the Internal Revenue Code of 1954 as amended and in effect
during the years in issue, and all Rule references are to the Tax Court Rules of Practice and
Procedure.

[2]Petitioner's second investment was actually made with G&L Management, Inc., a wholly
owned subsidiary of Southern Star. The parties do not contend that there is any special
significance to be attributed to the fact that the second transaction was with this subsidiary.
Therefore, for convenience, we will refer throughout to Southern Star.

*Jacobs v. Commissioner,* T.C. Memo. 1985-609. Thus, the essential question to be determined is whether this petitioner's case is factually distinguishable from *Hunter, Siegel,* and *Jacobs.* Petitioner contends that it is distinguishable.

### FINDINGS OF FACT

Some of the facts have been stipulated and they are so found. Petitioner's residence at the time of the filing of this petition was in Hialeah, Florida.

In and prior to 1971, petitioner's principal business was the management of beauty shops. In 1971, petitioner separated from his wife and allocated to her for her support many of the income-producing properties which comprised his beauty shop business. He also anticipated retirement upon reaching the age of 65 in 1975. Petitioner was looking for an investment which would produce significant income for his retirement years, when his income from other sources was expected to be materially reduced. In due course, petitioner inquired of Nathan Newman, an accountant, financial advisor, and attorney, who had been assisting petitioner for approximately 20 years, as to possible investments. Newman was then aware of the Southern Star program, and apparently had an arrangement with Southern Star for payment of a finder's fee for investors in the program produced by him, a fact which petitioner did not discover until long after his investments had been made. Newman recommended that petitioner invest in the Southern Star program, which was described by him to petitioner as one which would not require petitioner's personal attention, and would produce a regular income after retirement. Newman showed to petitioner a projection showing receipt of regular income after 1975. The projection had been prepared by a Mr. Levine who was described as a friend.[3] Petitioner thereafter made some projections, himself, but made no other investigation. Petitioner was relatively unsophisticated in making investments, and had become accustomed to relying upon Newman, whom petitioner regarded as capable and unbiased. Petitioner had no experience in either ownership or management of cattle and had no desire

---

[3]The friend, Ned Levine, is one of the incorporators of Southern Star. The record contains a projection made by petitioner after the fact, presumably in anticipation of this case.

to become a cattle operator. Petitioner's reliance upon Mr. Newman's advice under the facts of this case was reasonable.

On June 1, 1971, petitioner and Southern Star entered into a sales agreement providing for the purchase[4] of a herd of 25 purebred Aberdeen Angus cows and a one-third interest in a bull. Simultaneously with execution of the sales agreement, petitioner entered into a management agreement pursuant to which Southern Star undertook to manage the herd. Petitioner probably executed a number of related documents, as specified in these two agreements, including one or more promissory notes, a security agreement, and he may have received a separate bill of sale. On January 17, 1972, petitioner entered into a similar set of agreements for the purchase of a herd of five Aberdeen Angus cows and a two-thirds interest in an Aberdeen Angus bull. The principal reason for acquisition of the second herd was to obtain the contract right under the management agreement to have the herd include a bull calf out of Southern Star's prize bull. Petitioner never inspected the cattle allocated to his herds.

The parties have primarily sought to focus on the distinctions from and similarities to the facts in *Hunter,* *Siegel,* and *Jacobs.* Therefore, a discussion of Southern Star and its cattle program is a necessary background. Southern Star was organized in 1970 by Neil Levine and Harry Epstein.[5] It operated three cattle ranches—at Citra, Florida; Cassoday, Kansas; and Marshfield, Missouri. In general, the Southern Star program contemplated the purchase of one or more herds of cattle, varying in size, with herd management by Southern Star constituting an essential element of the program. The terms of the management agreements were indefinite, with termination to occur when the herds were liquidated. Liquidation was to occur upon notice under varying circumstances, the investor's opportunity to give notice being more restrictive than Southern Star's. While the management agreement remained in effect, the herds

---

[4]In describing petitioner's arrangement with Southern Star and with its subsidiary G&L Management, Inc., we use words such as "purchase," "sale," "owned," "owner," and similar terms simply for convenience but without intending any inference, by the use of these words, as to the tax characterization or consequences of any aspect of the transactions.

[5]The parties have so stipulated, and we made this finding of fact in *Hunter v. Commissioner,* T.C. Memo. 1982-126, although in fact one Erwin Gars was also an incorporator.

were to be managed solely in the discretion of Southern Star. Each management agreement provided specifically that, so long as the agreement was in effect, Southern Star had "full control of the location, maintenance, expansion, breeding, and culling" as well as the determination of the "most opportune time for sales." The size of each investor's herd was to be increased by about 50 percent through the retention of calves. Calves which were not so retained were to be sold by Southern Star and the proceeds divided between the parties, except that in all transactions except petitioner's 1971 purchase, the proceeds were applied first on the unpaid purchase price. The herds of specific investors such as petitioner were, at least in theory, identified by tattoo and ear tag numbers, but were mixed with other similar herds and other cattle of Southern Star and placed on one or more of the ranches in Southern Star's discretion.

The purchase price of petitioner's first herd was $62,500[6]; $10,000 of that sum was allocated to the one-third interest in a bull, reflecting a purported value for the bull of $30,000. The balance of $52,500 was allocated to the 25 cows, reflecting a purchase price per cow of $2,100. The sales agreement required a downpayment of $900 and installment payments of $300 per month, plus interest, starting July 1, 1971, for 30 months. Starting January 1, 1974, the monthly payments increased to $500 for the succeeding 90 months. Thus, within 10 years, $54,900 was specified in the contract to be paid on principal. The deferred payments were reflected by a nonrecourse promissory note.[7] Petitioner originally intended to make each of these payments as they came due.

Petitioner's second herd of five cows and a two-thirds interest in a bull (which actually turned out to be 2 one-third interests in two bulls) had a purchase price of $32,500. The downpayment was $1,000, and the balance was to be paid from 30 percent of the proceeds from the sales of cattle. The cows cost $2,500 each, and the bull was again valued at $30,000. Interest was required to be paid monthly

---

[6]It is unclear on this record whether all of the cows in this herd were registered Aberdeen Angus, since the description of the herd omits registration numbers for several animals.

[7]None of these notes are in the record. We assume that nonrecouse notes were executed as specified in the sales agreement.

from January 1, 1973, through December 1, 1974. Thereafter, interest was also payable from sales of cattle from the second herd. Petitioner was obligated under each management agreement to make substantial cash payments for Southern Star's services in increasing amounts in each of the first 3 years.

During 1971, petitioner paid in cash, interest, as well as principal and maintenance. Principal payments on the first herd were made through 1974, aggregating $15,900. No payments were made after 1975, and the payments in that year of interest and for management were less than $200. Petitioner continued to make the specified payments of principal through 1974, although he was aware of continuing deficiencies in Southern Star's management of the herds. He complained repeatedly about the inadequate calf crops, the failure to observe the 80-percent live birth guarantee,[8] and the failure to increase the size of his herd, but his complaints were unheeded. All of the animals in the two herds remained registered with the American Angus Association in the name of Southern Star. In 1979, petitioner filed suit against Southern Star in the Circuit Court of Dade County, Florida, but ultimately abandoned the suit.[9]

The animals allocated to petitioner's herds were of inferior quality, many having been purchased by Southern Star from the Black Watch Farm, a somewhat similar program which went into bankruptcy. The cows in petitioner's herds were worth no more than the average auction sale prices of Aberdeen Angus cattle during this period, $468 in 1971, and $526 in 1972. The bulls allocated to the herds were worth approximately $647 in 1971, and $740 in 1972.[10]

In 1981, Southern Star ceased business. It purported to recognize a dollar liability to petitioner, but no payments were made to him. No collection efforts were made by petitioner since he believed that Southern Star was without

---

[8]The 1971 agreements do not guarantee a stated percentage of live calf births, although such a guarantee was typically included in Southern Star's management agreements.

[9]The stipulation recites that the suit was filed in 1975, but the case number indicates that the suit was filed in 1979, and petitioner so testified.

[10]These values are based upon the testimony of respondent's expert, which we found thoroughly credible. Petitioner's expert was not nearly as knowledgeable of the sales prices of cattle or of the particular cattle involved here. His testimony was largely theoretical and valueless.

assets. Petitioner's herds were purportedly liquidated but petitioner never received any proceeds of sale. To the extent not sold to third parties, whatever was left of petitioner's herds was transferred to another cattle operation in Mississippi without petitioner's consent.

When petitioner made each of these investments in 1971 and 1972, he contemplated that his payments on the purchase price of the first herd, together with sales of culls and calves, would pay in full the purchase price of that herd by 1976 or 1977, and that the sales revenue generated from both herds would pay the purchase price of the second herd by 1979.

We have compared the sales and management agreements pertaining to petitioner's two herds with those involved in the *Siegel* and *Hunter* cases, and find that the differences in petitioner's documents are not material. Such differences as do exist are largely between petitioner's 1971 sales agreement and the *Siegel* and *Hunter* sales agreements.[11]

The cows in petitioner's 1971 herd cost $2,100 each, while in the *Siegel* herds of 10 cows, each cow cost $2,500. The one-third interest in the bull in each case cost $10,000. For the five cows in petitioner's second herd, the cost of the females had increased to $2,500 in line with the *Siegel* prices. Of considerably more significance, petitioner's 1971 agreement provided, as we have found, for payments on principal in amounts so that within 10 years, $54,000 out of the $62,500 purchase price would have been paid. In *Siegel,* as well as in *Hunter* and *Jacobs,* most of the purchase price was reflected by nonrecourse promissory notes payable during the term of the management agreements only out of that portion of the sales of cattle allocated to the investor. The more important factor is the extent of control over petitioner's cattle which remained vested in Southern Star pursuant to the management agreements.

---

[11]While there are a number of differences between petitioner's 1971 management agreements and those in *Siegel* and *Hunter,* none are material. In fact, most of the differences appear to be less favorable to the investor. The 1972 sales and management agreements signed by petitioner are substantially identical to those involved in *Siegel* and *Hunter.*

OPINION

## General

In *Hunter, Siegel,* and *Jacobs,* we held that the purported sales of cattle were so lacking in economic substance as to preclude being treated as sales for Federal income tax purposes and that the benefits and burdens of ownership did not pass to the investor. As we have indicated, our focus in this case is on whether petitioner's facts are sufficiently different from those in these three earlier cases to warrant a different result.

Petitioner argues that his motives in this case are not suspect, that he was not simply buying tax benefits but he believed that he was buying a herd of cattle which would increase in size and value, eventually including one bull from Southern Star's prize bull Emulous Bob of K Pride. Hence, petitioner argues, at the end of 10 years his herds would have been substantially more valuable than when he acquired them and would have been fully paid for.[12] Petitioner recognizes that his expectations assumed that Southern Star would carry out its obligations under the two management agreements and that because they did not do so, his expectations could not be fulfilled.

While petitioner's testimony as to his nontax motives is entitled to some credibility, we place greater weight on objective facts. *Dreicer v. Commissioner,* 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). In this case, petitioner's testimony and the objective facts are not so strongly conclusive with respect to the existence of a predominant non-tax motive as to mandate a finding to that effect. Moreover, the making of such a finding, were we to do so, would not resolve the case in petitioner's favor. For that reason we have made no finding as to profit motive. The existence of a profit motive simply does not preclude a determination either that a transaction lacks economic substance or that the benefits and burdens of ownership did not pass to petitioner.[13]

---

[12]Petitioner apparently contemplated remaining in the program for 10 years, although the 1971 management agreement covering his principal herd provided that Southern Star could liquidate the herd after June 1, 1980.

[13]This holding does not imply that evidence as to profit motive is immaterial.

A transaction which is devoid of economic substance is not recognized for tax purposes. *Frank Lyon Co. v. United States,* 435 U.S. 561, 573 (1978); *Knetsch v. United States,* 364 U.S. 361, 366 (1960). Moreover, it is the substance of a transaction which determines its tax consequences. It must in fact, not in expectation, be "imbued with tax-independent considerations." *Frank Lyon Co. v. United States,* 435 U.S. at 583-584; *James v. Commissioner,* 87 T.C. 905, 918 (1986). For a transaction to be recognized for tax purposes under *Frank Lyon Co.,* petitioner must show that his investment "was not motivated or shaped solely by tax avoidance features that have meaningless labels attached, but also that there is economic substance to the transaction independent of the apparent tax shelter potential." *Hilton v. Commissioner,* 74 T.C. 305, 349-350 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982).

We have never held that the mere presence of an individual's profit objective will require us to recognize for tax purposes a transaction which lacks economic substance.[14] The economic substance of a business transaction and the intent, purpose, or motive of an individual investor, while sometimes equated, are not identical. A business transaction by its very nature must have economic substance, that is, a realistic potential for profit (*James v. Commissioner,* 87 T.C. at 924). The phrase "realistic potential for profit" does not mean that the transaction must make a profit or even that similar transactions generally are profitable. As we found in *Abramson v. Commissioner,* 86 T.C. 360 (1986), only an average of 1 film in 10 is successful; in wildcat oil drilling, the success rate based upon the number of wells drilled may be low. Realistic

---

[14]In our decision in *Rice's Toyota World, Inc. v. Commissioner,* 81 T.C. 184, 196 (1983), affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985), we said:

"Where a taxpayer, cognizant of potential tax benefits, enters into a transaction of questionable economic worth, the tests developed under the sham transaction doctrine are applied to determine whether a threshold level of business purpose or economic substance is present."

Also at page 209 we again stated:

"In summary, the sham transaction theory is used to separate those 'business transactions' entitled to deference from those which are not. It requires that business transactions meet a minimum threshold of a business purpose or economic objective. * * *"

We did not by this language, or by any of the language in footnote 17, on page 203, intend to imply that a mere profit objective requires recognition of the transaction for tax purposes.

potential for profit is found, however, when the transaction is carefully conceived and planned in accordance with standards applicable to the particular industry, so that judged by those standards the hypothetical reasonable businessman would make the investment. The intent or purpose, which motivates an individual to enter into a business transaction refers to the subjective state of mind of the particular taxpayer before the Court.[15]

Subjective intent cannot supply economic substance to a business transaction. Where, as in the case at bar, we examine the transaction and conclude as we do in this case that Southern Star's herd investment packages lack any realistic potential for profit, we need not examine the investor's state of mind. This analysis, where it can be used, avoids the difficult task of weighing dual motives, such as we were forced to undertake in *Fox v. Commissioner,* 82 T.C. 1001 (1984). Because the Southern Star transactions in this case lack economic substance, as did those in three other investor cases we have decided, we hold, consistent with those opinions, that they are economic shams.

*Economic Substance*

The material facts with respect to the economic substance of this transaction do not differ significantly from those in *Hunter, Siegel,* and *Jacobs.* The initial factor considered by us in *Hunter, Siegel,* and *Jacobs* in our determinations that the Southern Star transactions lacked economic substance was "whether the stated price for the cattle is within the reasonable range of their value." The values determined by us for petitioner's cattle are the same values we determined for the Southern Star cattle involved in the *Siegel* case. Thus, as in *Siegel,* petitioner paid approximately 4½ times what the cows were worth in 1971 and in 1972. In the case of the bull, the purchase price was simply exorbitant, representing over 40 times the actual value. Respondent's expert expressed the opinion that if petitioner had in fact been sold top quality cows from an established cattle herd

---

[15]As we said in *Dreicer v. Commissioner,* 78 T.C. 642, 645 (1982), "His [the taxpayer's] motive is the ultimate question" in the application of sec. 183. We determine subjective intent largely by objective facts. Sec. 1.183-2(a), Income Tax Regs.

in a highly promoted program, a price of $1,250 to $1,500 would not appear to be unreasonable. This price is still substantially less than the price petitioner paid and substantially more than the cows were worth. Thus, this testimony is of little significance. Our concern is to compare the actual values of the cattle allocated to petitioner's herds with their purchase prices. Contrary to petitioner's expectations, the cattle allocated to him were not high quality; Southern Star's operation in 1971 and 1972 was not well established; and its management was seriously deficient. Moreover, the 1971 sales agreement shows no registration numbers for several of the cattle, which would tend to indicate that they may not in fact have been registered purebred Aberdeen Angus. The inferior quality of the cows prevented achievement of the guaranteed calf crop or the even better production rate to be found in a well-managed herd of quality cattle. We conclude that the stated prices for petitioner's cattle were not within the reasonable range of their actual values.

The second factor we considered in *Hunter, Siegel,* and *Jacobs* is whether there was any intent that the purchase price would ever be paid. We find in this case that at the time petitioner entered into the contracts, he did fully expect the purchase price on both contracts to be paid. In point of fact, however, the purchase price never would have been paid in this case. Petitioner's interest in the financial results of his investments, and his willingness to follow up with Southern Star, made it predictable that he would stop making principal payments as in fact he did. The poor quality of cattle allocated to petitioner's contracts, the poor quality of the management provided by Southern Star, and its consistent failure to perform in accordance with its agreement, including its failure to make good on its calf crop warrantee, precluded the sales of culls and calves from contributing to the payments of principal, and petitioner was relying on such sales to augment the principal payments he intended to make. Sales of calves could not contribute materially to liquidation of the purchase price, since the calving rate of the herds was substantially lower

than guaranteed.[16] Petitioner did not intend or contemplate paying the entire purchase price of both herds himself. Petitioner was sold cattle at a grossly inflated price. The notes being nonrecourse, he was not obligated to make any of the payments specified in the sales agreements, and as soon as he became convinced that he had been misled, he took appropriate action. His original intent to pay vanished. As we have said, this was predictable, and without substantial cash contributions, the purchase prices for the herds could not have been paid. While petitioner's original subjective intention was different from that of the investors in *Hunter, Siegel,* and *Jacobs,* his initial willingness to make cash payments cannot add sufficient substance to petitioner's transactions to warrant their recognition for tax purposes.

The third factor, petitioner's control over the cattle purportedly purchased, must be answered in the same fashion as we answered that issue in *Hunter, Siegel,* and *Jacobs.* Under the contracts, petitioner in fact had no control over the cattle until the purchase price was paid in full. Further, he had no ability to manage the cattle and no interest in so doing. He never intended at any time to take possession of his cattle. At the end of the term, it was his intent to sell the cattle either directly or through Southern Star.

The final factor, whether petitioner would receive any benefit from disposition of the cattle, must in this case receive the same answer as in other Southern Star cases. Until the purchase price with interest had been paid, petitioner had no right to take possession of the herds or retain any proceeds from their disposition. We have determined that this event would never occur.

*Benefits and Burdens of Ownership*

In addition, for the reasons which follow, the benefits and burdens of ownership were not in fact transferred to petitioner. Transactions similar to petitioner's investment in

---

[16]Although there is very little in the record as to purported purchases by Southern Star of cattle from Cherin, we assume that what purchases were made, were made at inflated prices as was true in *Siegel,* and that no cash payments were ever made to petitioner.

the Southern Star cattle program have been frequently analyzed by this Court on the basis of the following factors:

(1) Whether legal title passes;

(2) how the parties treat the transaction;

(3) whether the purported purchaser acquires any equity in the property;

(4) whether the contract creates a present obligation on the purchaser to make payments;

(5) whether the right of possession is vested in the purchaser;

(6) which party bears the risk of loss or damage to the property; and

(7) which party receives the profits from the sale of the property.

*Houchins v. Commissioner,* 79 T.C. 570, 591 (1982); *Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. 1221, 1237-1238 (1981); *Estate of Franklin v. Commissioner,* 64 T.C. 752, 763-770 (1975), affd. on other grounds 544 F.2d 1045 (9th Cir. 1976); *Harmston v. Commissioner,* 61 T.C. 216, 228-231 (1973), affd. 528 F.2d 55 (9th Cir. 1976).

The first sales agreement entered into by petitioner with Southern Star, in paragraph VII, refers to a separate bill of sale. For some reason, in the corresponding paragraph in the sales agreement dated January 17, 1972, the reference to a bill of sale is omitted. No copies of bills of sale are in this record. In *Siegel,* the corresponding paragraphs refer to a bill of sale although no bills of sale were placed in evidence in that case. However, for the purposes of our analysis, we will assume that bills of sale were actually given to petitioner by Southern Star and its subsidiary. Thus, bare legal title may have been transferred,[17] but courts have repeatedly "refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred." *Frank Lyon Co. v. United States,* supra at 572-573. As we explicitly found in *Siegel,* "Southern Star [in Mr. Cherin's case] retained full control over the cattle allegedly

---

[17]Under applicable State law the agreements of sale themselves may be sufficient to transfer legal title.

sold to petitioners which control extended to determining when and the price at which the cattle would be sold, and retaining all proceeds of said sales."[18] The significance of passage of bare legal title, if such occurred, is further eroded by the continued registration of the cattle purportedly purchased by petitioner in Southern Star's name. As in *Grodt & McKay Realty, Inc. v. Commissioner, supra,* such registration facilitated, and petitioner apparently acquiesced in, Southern Star's continued representation to the world at large that it was the owner of the subject cattle.

The parties did not treat the transactions as present sales. Petitioner acquired no rights or obligations and the purported sales had no effect on Southern Star's unilateral authority over the property purportedly sold. Petitioner had no voice in whether any particular cow was allocated to his herds, retained in his herds, sold, or transferred to another herd. There was, in fact, no segregation of the cattle into separate herds. From Southern Star's management perspective, all cows were in a single herd. Giving petitioner the benefit of every favorable tendency of the evidence, the most that we can conclude is that if the purchase price had been paid in full, petitioner might then have demanded possession of his herds. That never occurred and economically could not occur. Legally, practically, and realistically, petitioner provided Southern Star with funds to develop its own herd which in fact it failed to do. In exchange, he received tax benefits. This may not have been what petitioner intended, but it is what did happen and all that could happen with the poor quality cows which comprised the Southern Star herds and with the poor management practices. We believe that the control exercised in this case by Southern Star is one of the most important factors in determining what, if anything, petitioner acquired.

In *Siegel,* we held that given the substantial disparity between the stated purchase price and the fair market value of the cattle, petitioners acquired no equity in the cattle they purported to purchase. Here, petitioner may have acquired some equity in the females he purported to purchase in the first herd through his payments on principal. That would depend, in part, on the manner in which the

---

[18]*Siegel v. Commissioner,* T.C. Memo. 1985-441, 50 T.C.M. 888, 54 P-H Memo T.C. 85-1995.

payments were allocated between the purchase price of the interest in the bull, and the purchase price of the interest in the cows. As we have pointed out, the discrepancy between the value of the bull and the stated purchase price was grossly excessive, and allocation of principal to the bull purchase price would have gained little equity. However, petitioner stopped making payments and, in effect, abandoned whatever equity he may have had. He ultimately sought to recover his funds through a civil action in the State court. The promissory notes, if any, were actually signed, were nonrecourse, and petitioner had no actual obligation to make payments. Whatever payments he made were voluntary. He thus could, and did, voluntarily cease making payments.

Our findings that the benefits and burdens of ownership were not transferred to petitioner is further evidenced by the fact that, until the full purchase price and accrued interest and maintenance fees on each herd were paid, here as in *Siegel,* an extremely improbable event, petitioner did not have the right to possession of the cattle. Petitioner also did not bear the risk of loss or damage to the cattle, a risk Southern Star continued to bear. Finally, petitioner was not entitled to any profits from the sales of cattle under his second contract. It is unclear whether he had such a right under the first contract, although, in point of fact, he received no payments even though on paper some were purportedly credited to him. It is quite evident that Southern Star never had any intention of making any cash payments to petitioner or to its other investors.

Viewed in its entirety, the arrangement between petitioner and Southern Star does not support a finding that any benefits or burdens of ownership were transferred to petitioner. The failure to transfer the benefits and burdens of ownership supports our conclusion that no sale occurred for tax purposes. At least from Southern Star's standpoint, petitioner received tax benefits for his money, as Southern Star officials told him repeatedly. That this was not what petitioner intended or expected is unfortunate, but that does not change our analysis.

Based on our decisions in *Hunter, Siegel,* and *Jacobs,* we hold for respondent with respect to the deficiencies in this case. See, e.g., *Beck v. Commissioner,* T.C. Memo. 1987-359.

*Section 6621(c)*

By amendment to the answer, respondent asserted the applicability of section 6621(d), now section 6621(c), dealing with interest on a substantial underpayment attributable to a tax-motivated transaction. Because respondent has raised this issue for the first time in the answer, he bears the burden of proof. Rule 142(a); *Rose v. Commissioner,* 88 T.C. 386 (1987); *Zirker v. Commissioner,* 87 T.C. 970 (1986). Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate established under section 6621(b) where there is a "substantial underpayment" (an underpayment of at least $1,000) in any taxable year "attributable to 1 or more tax-motivated transactions." This section applies only with respect to interest accruing after December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(c). *Solowiejczyk v. Commissioner,* 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986).

Section 6621(c)(3)(A)(v) was added by Congress specifically to include a sham or fraudulent transaction within the scope of this additional interest section.[19] It is obvious that Congress intended to include as tax-motivated transactions, fake or fictitious transactions, such as we found in *DeMartino v. Commissioner,* T.C. Memo. 1986-263, and *Forseth v. Commissioner,* T.C. Memo. 1985-279. In addition, we have recently interpreted the language "any sham or fraudulent transaction" to include transactions where the taxpayer lacked profit motive and which were without economic substance. *Patin v. Commissioner,* 88 T.C. 1086, 1128-1129 (1987). As we have already noted, the presence of a profit motive does not preclude a determination that a transaction lacks economic substance and thus is a sham. The transactions between Cherin and Southern Star are "shams" for purposes of section 6621(c)(3)(A)(v), both because they lacked economic substance and because the benefits and burdens of ownership did not pass to him.

---

[19]Pub. L. 99-514, sec. 1535(a), 100 Stat. 2085, 2750.

We conclude that the sanction of section 6621(c) is otherwise appropriate in each of petitioner's years 1972 through 1978, except for the year 1977, where the underpayment is less than the sum of $1,000. The amounts of the underpayments which are attributable to tax-motivated transactions will be determined in the course of the Rule 155 determinations.

*Decision will be entered under Rule 155.*

Reviewed by the Court.
NIMS, PARKER, KÖRNER, SHIELDS, HAMBLEN, COHEN, CLAPP, JACOBS, GERBER, WRIGHT, PARR, WILLIAMS, and WELLS, *JJ.*, agree with the majority opinion.

---

SWIFT, *J.*, concurring: I wish to explain my reason for concurring in the result reached by the majority in this case but for not joining the majority opinion. The majority opinion concludes that the transaction before us lacked economic substance and cannot be recognized for tax purposes. I agree with that result. The majority opinion, however, also implies that a taxpayer's profit motive is not relevant or material to the determination of the economic substance of a transaction. With that proposition I disagree.

As we stated in *Dreicer v. Commissioner*, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983), "[the taxpayer's] motive is the ultimate question." Among the factors that should be considered in analyzing the taxpayer's motive are the economic substance of the transaction, and the testimony of the taxpayer concerning his intention and purpose for entering into the transaction. The taxpayer's self-serving testimony obviously is not controlling. It must be weighed against other objective factors, but certainly the taxpayer's testimony is relevant and material in the analysis of the economic substance of the transaction and in reaching the ultimate conclusion as to the taxpayer's motive. Again, in *Dreicer v. Commissioner, supra,* we stated—

[the ultimate question] must be determined by a careful analysis of all the surrounding objective facts, and greater weight is given to such facts than to [the taxpayer's] mere statement of intent. * * *

In this case, I would hold that petitioner's testimony concerning his purpose for entering into the transaction and the objective facts, *taken together*, fail to establish that the transaction had economic substance and fail to establish that petitioner had an actual and honest profit objective for entering into the transaction.

JACOBS, *J.*, agrees with this concurring opinion.

---

CHABOT, *J.*, concurring in part and dissenting in part: I agree with that part of the majority's opinion holding that the purported sales of cattle were lacking in economic substance, and that the benefits and burdens of ownership were not transferred to petitioner. Furthermore, I agree with the majority that no finding regarding petitioner's profit motive is needed to reach these conclusions, because (on the basis of the record' in the instant case) the result would be the same as to *these* issues, whether or not petitioner had a predominant profit motive.

However, I dissent from that part of the majority's holding that the transaction is a "sham", within the meaning of section 6621(c)(3)(A)(v).

Section 6621(c)[1] provides, in general, that the interest

---

[1]Sec. 6621(c) provides, in pertinent part, as follows:

SEC. 6621. DETERMINATION OF RATE OF INTEREST.

(c) INTEREST ON SUBSTANTIAL UNDERPAYMENTS ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS.—

(1) IN GENERAL.—In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the underpayment rate established under this section.

(2) SUBSTANTIAL UNDERPAYMENT ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS.—For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000.

(3) TAX MOTIVATED TRANSACTIONS.—

(A) IN GENERAL.—For purposes of this subsection, the term "tax motivated transaction" means—

(i) any valuation overstatement (within the meaning of section 6659(c)),

(ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8),

payable on substantial underpayments attributable to certain transactions is computed at 120 percent of the otherwise applicable rate. This provision was added by section 14(a) of the Tax Reform of 1984 (Pub. L. 98-369, 98 Stat. 494, 682), which specified four types of transactions that would trigger the increased interest rate provisions. Section 1535(a) of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085, 2750) added to the list of transactions "any sham or fraudulent transaction" by adding clause (v) to section 6621(c)(3)(A).

The majority hold that "The transactions between Cherin and Southern Star are 'shams' for purposes of section 6621(c)(3)(A)(v), both because they lacked economic substance and because the benefits and burdens of ownership did not pass to him".[2] (P. 1000.) I would hold that the transactions entered into by petitioner are not shams as that term is used in section 6621(c)(3)(A)(v), because respondent failed to establish[3] that petitioner lacked a profit motive in entering into the transaction.

In providing for the higher interest rate, the Congress chose to use the "handle" of "tax motivated transactions". This term suggests that the taxpayer's motive is to be critical in determining whether the higher interest rate is to apply. However, the Congress chose to provide a complete definition of this term in paragraph (3)(A) of section 6621(c). An examination of the first three clauses of this definition suggests an intention that the taxpayer's motive ordinarily

(iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092), and

(iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, and

(v) any sham or fraudulent transaction.

[2] I read this statement as indicating that either lack of economic substance or the failure of the benefit and burdens of ownership to pass will cause the transaction to be deemed a "sham".

[3] As the majority point out, respondent bears the burden of proof on this issue in the instant case. (P. 1000.) The majority find that "In this case petitioner's testimony and the objective facts are not so strongly conclusive with respect to the existence of a predominant nontax motive as to mandate a finding to that effect". (P. 992.) Since the majority do not conclude that petitioner lacked a profit motive, where the burden is on respondent we can conclude that respondent has failed to prove that petitioner did not have a profit motive for entering into the transaction. See, e.g., *Anselmo v. Commissioner*, 80 T.C. 872, 886 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). Consequently, I would hold that the section 6621(c) increased interest rate does not apply because respondent failed in his burden of proving a necessary element, the lack of a profit motive.

(perhaps, always) plays no part in the determination of whether a transaction is a tax-motivated transaction because it comes within one or more of these three clauses. Clause (iv), authorizing respondent to add more categories of tax-motivated transactions, is not so limited. Clause (iv) authorizes respondent to provide by regulations that certain activities constitute tax-motivated transactions. Three of the activities so specified in sec. 301.6621-2T, Proced. & Admin. Regs., depend on the taxpayer's purposes.[4] The regulation was adopted on December 26, 1984, by T.D. 7998, 1985-1 C.B. 368, 49 Fed. Reg. 50390 (Dec. 28, 1984).

Thus, when the Congress added "(v) any sham or fraudulent transaction", in the Tax Reform Act of 1986, the Congress had before it a definition of tax-motivated transaction that was mostly "no-fault" but that had some alternatives that depended on the taxpayer's motives. The question in the instant case is whether "sham" is to be no-fault or is to be affected by petitioner's motives.

The majority contend that "the presence of a profit motive does not preclude a determination that a transaction lacks economic substance and thus is a sham". (See p. 1001.) I disagree with their application of this analysis to section 6621(c)(3)(A)(v).

The intended effect of the 1986 amendment to section 6621(c) is expressed in the Statement of the Managers attached to the Conference report (H. Rept. 99-841 (Conf.) II-796 (1986), 1986-3 C.B. (Vol. 4) 796), as follows:

> The Tax Court has recently held (*DeMartino v. Comm'r.,* T.C. Memo 1986-263 (June 30, 1986); *Forseth v. Comm'r.,* T.C. Memo 1985-279 (June 11, 1985)) that sham transactions that would be subject to this special interest rate were they not shams are not subject to this special interest rate because they are shams. The conferees view it as anomalous that a genuine transaction (lacking the proper profit motive) would be subject to a higher interest rate, while a sham transaction, *which is significantly more abusive,* would escape the higher interest rate simply because it is a sham. Accordingly, the conference agreement, consistent with the legislative intent in originally enacting section 6621(d) in 1984 [redesignated as sec. 6621(c) by the Tax Reform Act of 1986], explicitly adds sham or fraudulent transactions to the list of transactions subject to this higher

---

[4]A-3(9)(ii) depends on whether the taxpayer had tax-avoidance purposes and not business purposes. A-4(1) depends on whether the activity was engaged in for profit. A-4(2) depends on whether the transaction was entered into for profit.

interest rate. The intent of the conferees is to reverse the holding of these Tax Court cases on this issue. [Emphasis added.]

In *Forseth v. Commissioner,* T.C. Memo. 1985-279, the Court was faced with a motion by respondent to amend his answer to assert the applicability of section 6621(d).[5] Respondent had raised numerous alternative grounds for disallowance of the losses. One of the grounds was: "The alleged contracts were fictitious or *preconceived shams lacking economic substance.*" (Emphasis added.) We stated as follows in *Forseth* (50 T.C.M. at 113, 54 P-H Memo T.C. par. 85,279 at 85-1250):

respondent has thus raised numerous alternative grounds for disallowance, not all of which are "tax motivated transactions" *as defined in section 6621(d)(3)(A).*[6] [Emphasis in original.]

[6]We recognize that our holding means that a real straddle not meeting the requisite profit standard might constitute a "tax motivated transaction" under sec. 6621(d), whereas a purely fictitious "straddle" would not. While this result might seem anomalous, we believe that it is the necessary consequence of the absence of such factual sham transactions from the statutory or regulatory definitions of tax motivated transactions, and of the explicit inclusion by Congress, by reference to the definition of "straddle" in sec. 1092(c), of transactions which are straddles not just in form but in substance.

The opinion in *Forseth* dealt with "preconceived shams lacking in economic substance", that is, those situations where, together with a fictitious transaction there is the absence of an honest profit objective. In our later opinion in the same case, *Forseth v. Commissioner,* 85 T.C. 127 (1985), affd. sub nom. *Mahoney v. Commissioner,* 808 F.2d 1219 (6th Cir. 1987), and sub nom. *Enrici v. Commissioner,* 813 F.2d 293 (9th Cir. 1987), and affd. per order (11th Cir., Aug. 29, 1986), and (5th Cir., Jan. 14, 1987), and on appeal (7th Cir., Feb. 4, 1986), we concluded (85 T.C. at 165):

Petitioners have failed to prove that there was any actual gold or platinum, that there was any real market or trading, or that there was any purpose, other than the avoidance of taxes, for any of the transactions in issue. [Fn. ref. omitted.]

[5]The Tax Reform Act of 1984 originally enacted the provision dealing with interest on substantial underpayments attributable to tax-motivated transactions as subsec. (d) of sec. 6621. The Tax Reform Act of 1986 redesignated this provision as subsec. (c) of sec. 6621.

In *DeMartino v. Commissioner*, T.C. Memo. 1986-263, we concluded (51 T.C.M. at 1288, 55 P-H Memo T.C. par. 86,263 at 86-1114):

There, as here, though the taxpayers *appeared* to be utilizing an organized market, they were in fact *creating* a market for their transactions at prices they established for ulterior purposes. [Emphasis in original.]

As is indicated in the portion of the Statement of Managers quoted above, the intent of section 6621(c)(3)(A)(v) was to reverse our decisions in *Forseth v. Commissioner*, T.C. Memo. 1985-279, and *DeMartino v. Commissioner*, T.C. Memo. 1986-263. In these cases it was clear that the taxpayers did not have profit motives. From this, I conclude that the anomalous result that the Congress intended to avoid by enacting the "sham" clause was the avoidance of the higher interest rate where there was no substantial profit motive or there was a motive to deceive or create an appearance of economic substance, knowing that it was only a facade.

Further evidence that the Congress meant for us to read an intent requirement into the word "sham" as used in section 6621(c)(3)(A)(v), is found in the fact that the term is paired with the term "fraudulent". This appears to have been done in an effort to ensure that an abusive transaction would not escape the higher interest rates mandated by section 6621(c). That a finding of fraud requires a finding of improper intent is too well-established to require citation. The fact that "sham" was listed with "fraudulent", absent any evidence that Congress was attempting to remedy two completely dissimilar problems by adding the one five-word clause, indicates that "sham" as well as "fraudulent" was meant to carry with it an intent requirement.

The majority's analysis leads to harsh results in other cases.

For example, suppose that a taxpayer's employee embezzles funds in year 1 by fictitious purchases of inventory items. The taxpayer's tax return for year 1 reflects the fictitious transactions as increases in cost of goods sold. When the embezzlement is discovered, in year 3, it is clear that the original treatment of the matter as increased cost of goods sold for year 1 was erroneous. Instead, the

embezzled amounts are deductible for year 3, the year the embezzlement was discovered. Sec. 165(e). If a notice of deficiency for year 1 were issued before the taxpayer filed an amended return for that year, then there would be a deficiency for year 1. That deficiency would be attributable to a transaction that lacked economic substance (since the reported inventory purchases never occurred) or to a transaction in which the benefits and burdens of ownership did not pass. If the majority follow the analysis they set forth in their opinion in the instant case, then they would hold that the transactions are shams and the taxpayer's business and profit-seeking motives are irrelevant for purposes of section 6621(c)(3)(A)(v), and that the taxpayer would have to suffer the increased interest rate.

The majority would arrive at the same result if the embezzlement were by way of fictitious purchases of supplies and small tools.[6] Since the purchases never, in fact, occurred, the majority would treat the asserted purchases as shams, either because of the economic-substance analysis or the benefits-and-burdens analysis. The majority, under their no-fault analysis of the instant case would then impose the additional interest rate on the luckless taxpayer.

The imposition of the additional tax in such cases would not be commanded by the language that the Congress enacted, nor by the legislative history. Yet, this result would flow inexorably from the majority's definition of "sham" for purposes of section 6621(c)(3)(A)(v).

I am reluctant to believe that the Congress added the sham or fraudulent transaction clause in order to impose penalty interest on the unwitting victim in a business embezzlement or investment swindle case. Accordingly, I would hold that a transaction would not be punished under clause (v) of section 6621(c)(3)(A) if the taxpayer's purpose in entering into the transaction would satisfy the purpose aspect of the deduction requirements of section 162(a) or 212.[7]

---

[6] Since these expenditures would be deductible in arriving at adjusted gross income, as would theft, this presumably would not present the mitigation problems dealt with in the various opinions in *B.C. Cook & Sons, Inc. v. Commissioner*, 59 T.C. 516 (1972), and *B.C. Cook & Sons, Inc. v. Commissioner*, 65 T.C. 422 (1975), affd. 584 F.2d 53 (5th Cir. 1978). See especially the concurring opinion of Judge Tannenwald, 59 T.C. at 522.

[7] The majority refer to *Patin v. Commissioner*, 88 T.C. 1086 (1987). In that case, we stated that "it is abundantly clear that sufficient business activity did not exist which would support

In determining whether the exculpatory purpose exists, it may be appropriate to be guided by the following comments of Judge Simpson in *Dreicer v. Commissioner*, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983):

[The taxpayer's] motive is the ultimate question [in deciding whether to apply sec. 183]; yet, it must be determined by a careful analysis of all the surrounding objective facts, and greater weight is given to such facts than to his mere statement of intent. * * *

I would hold that, because respondent (who has the burden of proof in the instant case, see note 3, *supra*) did not establish that petitioner lacked a profit motive, the transaction is not a "sham" within the meaning of section 6621(c)(3)(A)(v).

This may be of small comfort to petitioner in the instant case because much of his underpayment may be attributable to a valuation overstatement (sec. 6621(c)(3)(A)(i)), in accordance with our analyses in *Rose v. Commissioner*, 88 T.C. 386, 424-427 (1987), and *Zirker v. Commissioner*, 87 T.C. 970, 978-982 (1986). However, the rationale used by the majority in the instant case would lead to unwarranted sanctions in other cases, and so I must respectfully dissent from the majority's analysis and conclusion regarding the section 6621(c) issue.

---

STERRETT, *Chief Judge*, dissenting: While I do not necessarily disagree with the result reached by the majority, because I so strongly disagree with a portion of the analysis used by the majority in reaching that result, I must dissent.

The majority holds that expenses and losses attributable to a transaction that lacks economic substance—that is, a transaction that lacks a realistic potential for profit—are not deductible regardless of whether the taxpayer participated in the transaction with the primary purpose and objective of making a profit. In my view, this holding is in

an objective finding that the transactions herein had a business purpose". 88 T.C. at 1117. Much of the remainder of that opinion emphasizes the overwhelming focus of the taxpayers on tax benefits and the taxpayers' indifference to rights and profits. Finally, the *Patin* opinion emphasizes that "we have explicitly found that the disputed transactions were not entered into for profit." 88 T.C. at 1129. Thus, *Patin* is distinguishable from the instant case.

direct conflict with those cases that hold that if a taxpayer engages in a transaction or activity with the primary purpose and objective of making a profit, the expenses and losses attributable to the transaction or activity are deductible as trade or business expenses under section 162, as expenses incurred for the production of income under section 212, or as losses under section 165. See *Commissioner v. Groetzinger*, 480 U.S. __, __ (1987); *Capek v. Commissioner*, 86 T.C. 14, 36 (1986); *Lemmen v. Commissioner*, 77 T.C. 1326, 1340 (1981); *Jasionowski v. Commissioner*, 66 T.C. 312, 318-319 (1976).[1]

Whether a taxpayer has an actual and honest profit objective is a question of fact, to be resolved on the basis of all the facts and circumstances of the case, and greater weight should be given to objective facts than to mere statements of intent by the taxpayer. Sec. 1.183-2(b), Income Tax Regs.; *Gefen v. Commissioner*, 87 T.C. 1471, 1497 (1986); *Dreicer v. Commissioner*, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). To be sure, a transaction's ·economic substance (or lack thereof) is an objective fact tö be considered in determining whether a taxpayer participatéd in the transaction with the requisite profit objective. However, in my view, the presence or absence of economic substance, standing alone, is not dispositive as the majority so holds; rather, as we noted in *Dreicer v. Commissioner, supra* at 645, "[the taxpayer's] motive is the ultimate question."

Because the majority holds that expenses and losses attributable to a transaction that lacks economic substance are not deductible regardless of whether the taxpayer participated in the transaction with the primary purpose and objective of making a profit, I dissent.

---

[1] I do not mean to suggest that a taxpayer's profit motive (or lack thereof) is relevant in determining whether a transaction constitutes a bona fide sale in the first instance. Whether a transaction constitutes a sale for tax purposes depends on whether the benefits and burdens ·of ownership pass from one party to another. *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237 (1981). As we noted in *Grodt & McKay Realty, Inc.*, however, a transaction that purports to be a sale, but which is not, is not necessarily a sham. 77 T.C. at 1243. I agree with Judge Chabot that a transaction is a "sham" for purposes of sec. 6621(c)(3)(A)(v) only if the taxpayer participates in the transaction without the primary purpose and objective of making a profit, which is precisely the same standard for determining whether a taxpayer's expenses and losses are deductible under secs. 162, 165, and 212.