LEWIS ARTHUR MERRYMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; MICHAEL A. CARROLL AND MARGARET W. CARROLL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Merryman v. Commissioner
Docket Nos. 10702-85; 24893-85.
United States Tax Court
T.C. Memo 1988-72; 1988 Tax Ct. Memo LEXIS 98; 55 T.C.M. (CCH) 191; T.C.M. (RIA) 88072; 99 Oil & Gas Rep. 642; February 23, 1988. T. Glynn Blazier, for the petitioners. Timothy W. Burgmeier, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: In timely statutory notices of deficiency, respondent determined a deficiency in petitioner Lewis Arthur Merryman's 1980 joint Federal income tax in the amount of $ 13,645.90, and a deficiency in the 1980 joint Federal income tax of petitioners Michael A. Carroll and Margaret W. Carroll in the amount of $ 3,556.60. Respondent also determined that petitioners Michael A. Carroll and *99 Margaret W. Carroll are liable for an addition to tax under section 6651(a)(1) [1] in the amount of $ 54.42 for untimely filing their 1980 joint Federal income tax return. In these consolidated cases, the primary issue for decision is whether a partnership is to be disregarded for Federal income tax purposes. FINDINGS OF FACT Many of the facts have been stipulated and are found accordingly. Petitioner Lewis Arthur Merryman was married during the year in issue to Norma Merryman, who is now deceased. [2] Mr. Merryman resided in Crowley, Louisiana, at the time his petition was filed. Mr. Merryman filed a joint Federal income tax return with his wife for 1980. Petitioners Michael A. Carroll and Margaret W. Carroll were husband and wife during the year in issue, and resided in Austin, Texas, at the time they filed their petition. The issues *100 in this case arise out of the relationship between Pernie Bailey Drilling Company ("Pernie Bailey"), a closely held oil and gas drilling company, and a number of related entities. Pernie Bailey was incorporated under the laws of Texas in the early 1940's. Pernie Bailey's principal office is in Houston, Texas. Pernie Bailey drills oil and gas wells in Texas and Louisiana for major and independent oil and gas companies. When formed, Pernie Bailey owned one drilling rig. By 1980, Pernie Bailey owned five drilling rigs. The officers and key employees of Pernie Bailey were the following: President and Chairman of the Board of Directors
William Washburn
Vice President and Controller
Willis Duhon
Operations Manager
O. D. Pharris
Engineer
John Washburn
Drilling Superintendent
Lewis Merryman
(petitioner)
In 1977, Southland Energy Corporation ("Southland"), a Louisiana corporation, was formed as a vehicle through which the key employees of Pernie Bailey could obtain interests in oil and gas exploration and development leases. Through June 30, 1981, Southland had 114 shares of stock outstanding which were owned as follows: Shares
Percentage
Shareholder
Held
Interest
Pernie Bailey
34
29.825
William Washburn
20
17.545
Willis Duhon
20
17.544
O. D. Pharris
20
17.544
John Washburn
10
8.771
Lewis Merryman (petitioner)
10
8.771
Total
114
100.000
*101 Southland did not own a drilling rig, but typically hired drilling companies to drill wells with respect to the leases it acquired. Prior to April 1, 1980, all of the stock of Pernie Bailey was owned by William Washburn and members of his immediate family, including his daughter Margaret W. Carroll, who is one of the petitioners in these consolidated cases. On April 1, 1980, The Washburn Company, a family partnership, was formed under Louisiana law, and the members of the Washburn family transferred their stock in Pernie Bailey to the partnership. William Washburn owned a 29.8761 percent interest in The Washburn Company in his individual capacity and a 15.4091 percent interest therein jointly with his wife. Mrs. Carroll and the other six Washburn children each owned a 7.8164 percent interest in The Washburn Company. In December of 1980, Pernie Bailey contracted with Champlin Petroleum Company for the drilling of additional oil and gas wells in Burleson County, Texas. Because Pernie Bailey did not have a rig available for this job, Pernie Bailey purchased necessary parts and constructed an additional drilling rig. The other five drilling rigs it owned had been purchased *102 as completed rigs. The cost to Pernie Bailey of constructing the new rig (hereinafter sometimes referred to as "Rig 21") was $ 1.6 million. Instead of retaining ownership of Rig 21 and contracting to drill the oil and gas wells for Champlin Petroleum Company, as soon as construction of the rig was completed on December 15, 1980, Pernie Bailey purported to sell ownership of Rig 21 to The Keeman Company (hereinafter sometimes referred to as "Keeman" or "the partnership"), a general partnership which also was formed on December 15, 1980, by the key employees of Pernie Bailey. As part of the transaction, Pernie Bailey entered into what was referred to as a "rig management agreement," or management contract with Keeman for Pernie Bailey to manage all aspects of the operation of the rig. Effectively, Pernie Bailey agreed to operate Rig 21 as if it owned the rig. Under the agreement, Pernie Bailey assumed all risk of damage to the rig caused by its gross negligence or willful misconduct. Pernie Bailey also agreed to hold harmless and to indemnify Keeman for any and all liability arising from operation of the rig. The stated sales price of Rig 21 to the partnership was $ 2.25 million. *103 No downpayment was required and the entire purchase price was to be paid by Keeman in installment payments of $ 39,718.65 per month for seven years. Interest was to accrue on the purchase price at the rate of 12 percent per year. A recourse promissory note and a chattel mortgage on the rig were executed by William Washburn on behalf of Keeman in favor of Pernie Bailey. The stated reason for the formation of Keeman and for the transfer of Rig 21 to the partnership was to provide the key employees of Pernie Bailey with a source of additional current income and with further opportunity to obtain ownership interests in different aspects of the oil and gas industry, opportunities which were not available to them through Pernie Bailey because the Washburn family was not willing to relinquish its exclusive control of that company. Also, the stated reasons for not selling the rig to Southland was that Southland was engaged only in the exploration and development of oil and gas leases, not in the drilling of wells, and that Southland was reinvesting its funds in new projects with no current dividend payout to its shareholder. The initial ownership interests of the partners of Keeman *104 were as follows: Percentage
Partner
Ownership
Pernie Bailey
10.000
The Washburn Company
19.825
William Washburn
17.545
Willis Duhon
17.544
O. D. Pharris
17.544
John Washburn
8.771
Lewis Merryman (petitioner)
8.771
Total
100.000
The above ownership interests reflect the same percentage ownership interests the key employees owned in Southland. The only capital funds contributed to Keeman was $ 1,000, which was transferred by Pernie Bailey to the partnership in December of 1980. The Keeman partnership agreement also provided that net profits or losses would be allocated to the partners in accordance with their ownership interests initially acquired upon formation of the partnership. In addition to managing the operation of Rig 21 and to assuming essentially all risks associated therewith, Pernie Bailey was to be the managing partner of Keeman and was given full and sole control over partnership affairs pursuant to Article VII of the partnership agreement which provided, in part, as follows: ARTICLE VII
MANAGEMENT
Pernie Bailey Drilling Company shall be Managing Partner and shall exercise full and sole control over the *105 conduct of the partnership business. The Managing Partner may engage in any activity on behalf of the partnership for the improvement, preservation, or protection of property and the success and welfare of the partnership. * * * Under the rig management agreement, Pernie Bailey agreed to manage Rig 21 for Keeman for a six-month period beginning December 15, 1980, and continuing for successive six-month terms unless the agreement was terminated by either party upon 30 days written notice. The management agreement provided generally that Pernie Bailey was to collect all receipts attributable to the operation of Rig 21, deduct from the receipts all costs of operating the rig, and remit to Keeman remaining net profits, if any. Pernie Bailey was given three months to collect receipts attributable to the operation of Rig 21, and Pernie Bailey agreed to pay Keeman the amount of net profits within three months after the net profits were earned even if the related receipts had not been collected. Pernie Bailey agreed to pay Keeman interest at 12 percent per year on net profits not paid to the partnership within 10 days after they were due. In addition to reimbursing Pernie Bailey for *106 all of its direct costs of operating the rig, the Keeman partnership agreed to pay Pernie Bailey a management fee of $ 500 each day the rig was operated as reimbursement to Pernie Bailey for its overhead costs not directly chargeable to Rig 21. The Keeman Company's books and records were maintained on the accrual basis for tax purposes. Reflected below, for the periods indicated, are the accrued receipts and expenses relating to the operation of Rig 21, the accrued payments due Pernie Bailey on the promissory note, and the net accrued funds available for distribution to the partners of Keeman: Total
Dec. 15 -
Jan. 1 -
Dec. 15,1980-
Dec. 31, 1980
June 30, 1981
June 30, 1981
Accrued gross receipts
$  67,000.00
$  790,890.61
$  857,890.61
Less;
Direct operating expenses
of Pernie Bailey
35,182.85
460,835.61
496,018.46
Management fee due
Pernie Bailey
8,000.00
90,500.00
98,500.00
Accrued net operating profit
23,817.15
239,555.00
263,372.15
Less:
Payments due to Pernie
Bailey on promissory note
--
238,311.90
238,311.90
Available for distribution to
partners of Keeman
[3] $  23,817.15
$    1,243.10
$   25,060.25
*107 Accrued net operating profits, for the most part, were not paid by Pernie Bailey to Keeman on a timely basis, and payments due on the partnership's promissory note to Pernie Bailey were not paid timely. Not until June 25, 1981, did Pernie Bailey pay Keeman the net profits due for December of 1980. Also on June 25, 1981, Pernie Bailey paid Keeman a portion of the net profits due for the period January through June of 1981. The balance of the net profits due Keeman for the January through June 1981 period was paid by Pernie Bailey on October 27, 1981. Pernie Bailey did not pay Keeman the 12-percent interest due on delinquent payments of net profits. The installments due on Keeman's promissory note to Pernie Bailey for January, February, March, and April of 1981 were paid untimely on June 25, 1981. The installments for May and June of 1981 were paid on June 29, 1981. Pernie Bailey was paid the $ 500 per day management fee with respect to Rig 21 for the period December 15 through December 31, 1980, in the total amount of $ 8,000 on June 29, 1981. *108 The management fee for the period January 1 through June 30, 1981, in the amount of $ 90,500 was paid to Pernie Bailey on October 27, 1981. On June 30, 1981, the partners of Keeman transferred the assets and liabilities of Keeman to Southland in exchange for 100 shares of the common stock of Southland in a nontaxable exchange governed by section 351. The 100 shares of Southland common stock were allocated among the partners of Keeman as follows: Number of
Partner
Shares Allocated
Pernie Bailey
10.000
The Washburn Company
19.825
William Washburn
17.545
Willis Duhon
17.544
O. D. Pharris
17.544
John Washburn
8.771
Lewis Merryman (petitioner)
8.771
Total
100.000
Southland agreed to assume the balance due on the promissory note payable to Pernie Bailey and to assume Keeman's responsibilities under the rig management agreement. The stated reason for the exchange of the partnership interests in Keeman for stock in Southland was to obtain the protection of limited liability afforded by corporate ownership of the drilling rig. Keeman never distributed any funds to its partners as partnership distributions, and the funds that were *109 available for distribution were transferred to Southland in early 1982. Pernie Bailey continued to operate Rig 21 until early 1983. Gross receipts, operating expenses, management fees, net profits, and note payments with respect to Rig 21 after its transfer to Southland, where disclosed in the record, are set forth below: Fiscal Year Ended
March 31, 1982 *
March 31, 1983
Accrued gross receipts
$  2,096,818.27
$  531,404.18
Less:
Direct operating expenses
of Pernie Bailey
1,086,481.62
620,498.51
Management fee due
Pernie Bailey
--
--
Accrued net operating profit
--
--
Less:
Payments due to Pernie Bailey
on promissory note
476,623.80
--
Available for distribution
--
--
Keeman's Federal partnership income tax return for its short taxable year ending December 31, 1980, after interest and depreciation, reflected a net loss of $ 16,198.85 and an investment tax credit with respect to Rig 21 in the amount of $ 225,000. Keeman's Federal partnership income tax return for its taxable period ending June 30, 1981, after interest and depreciation, reflected *110 a net loss of $ 41,825. On their 1980 joint Federal income tax return, petitioner Lewis Merryman and his wife claimed an investment tax credit of $ 15,087 with respect to Lewis Merryman's interest in the Keeman partnership. A $ 1,421 loss with respect to Lewis Merryman's share of Keeman's net loss also was reported on the joint return. On their untimely filed 1980 joint Federal income tax return, petitioner Margaret W. Carroll and her husband claimed an investment tax credit of $ 3,486.60, and a $ 251 loss with respect to Margaret Carroll's interest in Keeman. In notices of deficiency to petitioners, respondent disallowed the investment tax credits and the losses claimed with respect to petitioners' interests in Keeman. OPINION This case does not involve an underlying transaction that was engaged in solely for tax benefits, that lacked economic substance, or that must be disregarded for Federal income tax purposes. See, e.g., Larsen v. Commissioner, 89 T.C. -- (Dec. 30, 1987); Cherin v. Commissioner,89 T.C. 986 (1987); Helba v. Commissioner,87 T.C. 983 (1986); Falsetti v. Commissioner,85 T.C. 332 (1985); Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221 (1981). *111 The underlying transaction involved in this case (namely, the operation of Rig 21 on a contract basis for unrelated oil and gas exploration and development companies) clearly had economic substance and was entered into for profit. What is involved in this case is the form the transaction took or particular aspects of that form (namely, the formation and role of Keeman in the operation and ownership of the rig). Despite a finding that an underlying transaction possesses economic substance, the form in which a transaction is cast (or parts thereof) may be disregarded for Federal income tax purposes, and the form of the transaction may be recast to conform to its true nature. Packard v. Commissioner,85 T.C. 397, 419 (1985). When the form chosen by a taxpayer for a transaction has no business purpose, when the parties privy to the underlying transaction themselves disregard the form of the transaction, or when the form chosen serves no purpose other than the accretion of tax benefits, the form utilized by the parties may be disregarded. Commissioner v. Court Holding Co.,324 U.S. 331, 334 (1945); *112 Gregory v. Helvering,293 U.S. 465, 469 (1935); Packard v. Commissioner,supra at 422; Cirelli v. Commissioner,82 T.C. 335, 348 (1984). Also, when the form of a transaction (or a part thereof) represents merely one of a series of interrelated steps which, when viewed as a whole, do not justify giving tax recognition to the form chosen by the parties, such form may be disregarded and the interrelated steps may be collapsed or recast to reflect more accurately the substance of the underlying transaction. Minnesota Tea Co. v. Helvering,302 U.S. 609, 613 (1938); Redwing Carriers, Inc. v. Tomlinson,339 F.2d 652, 658 (5th Cir. 1968); Penrod v. Commissioner,88 T.C. 1415, 1428 (1987); Packard v. Commissioner,supra at 419-420. After carefully examining the formation and operation of the Keeman partnership, we conclude that its existence must be disregarded for Federal income tax purposes. Although Keeman purportedly was established for the ownership of a drilling rig, all of the operational responsibilities of owning Rig 21 were delegated to Pernie Bailey, *113 and Pernie Bailey was delegated all management responsibility for both the day-to-day operation of Rig 21 and for the internal business of the partnership (e.g., bookkeeping and payment of bills). In spite of the fact that the partnership was to purchase a piece of equipment for a stated purchase price of over $ 2 million, the only credible evidence before us indicates that the individual partners of Keeman invested no capital in the partnership, and that Pernie Bailey only invested $ 1,000 therein. The nominal amount of capitalization apparently was tolerated because the individual partners had no real financial risks associated with their interests in the partnership. As explained, all risks associated with the operation of Rig 21 were assumed by Pernie Bailey. Although the risk of financial losses nominally was to be borne by the partnership, in fact any real financial exposure was minimized, if not eliminated, by the lack of capital invested by the partners, by the financing of 100 percent of the "purchase price" of the rig by Pernie Bailey (the nominal seller), and by Pernie Bailey's role as managing partner of Keeman. These factors, taken together, effectively insulated *114 the partners of Keeman from any of the financial risks borne by partners in a true, economically viable general partnership. Pernie Bailey as builder of the rig and as operator thereof bore all of the risks of ownership of the rig. Events subsequent to the formation of Keeman corroborate our analysis. Payments due Keeman from Pernie Bailey and payments due from Keeman to Pernie Bailey were late. Interest due on late payments was ignored. What funds were available for distribution to the partners of Keeman (the stated objective for the existence of Keeman) were not so distributed but were transferred to Southland in early 1982. When the drilling business turned sour in 1983 and the rig became inactive, payments due on the promissory note to Pernie Bailey apparently terminated with close to $ 2 million still due on the note. We recognize and have taken into account the fact that certain key employees of Pernie Bailey (that were not members of the Washburn family) theoretically stood to benefit from net profits of the partnership remaining after note payments had been made on the promissory note. They also stood to benefit from the significant tax benefits to be realized if the *115 partnership is recognized for tax purposes. The primary problem with Keeman, as explained, is that none of the risks or burdens of partnership ownership realistically were placed on the partners. In addition, other than William Washburn as an officer of Pernie Bailey, the other nominal partners in Keeman had little, if any, say in the activities of Keeman, how it was formed, or how it was terminated. In effect, Keeman was merely a paper conduit operated by Pernie Bailey in such a manner that it was merely carrying on the corporate business of Pernie Bailey. Cirelli v. Commissioner,supra at 348. For Federal income tax purposes, Keeman must be ignored, and Pernie Bailey is to be regarded as owning Rig 21 during the year in issue. In summary, what was found by the Supreme Court in Gregory v. Helvering,supra, is similar to what we find herein. Keeman was -- Simply an operation having no business or corporate purposes -- a mere device which put on the form of [a partnership] * * *. No doubt, a new and valid [entity] was created. But that [entity] was nothing more than a contrivance * * * . It was brought into existence for no *116 other purpose; it performed, as it was intended from the beginning it should perform, no other function. [293 U.S. at 469.]
Because we conclude that Keeman cannot be recognized for Federal income tax purposes, we need not address various alternative arguments raised by respondent. Respondent also determined an addition to tax under section 6651(a)(1) against petitioners Michael A. Carroll and Margaret W. Carroll for untimely filing their 1980 joint Federal income tax return. These petitioners' bear the burden of proof concerning this issue. Rule 142, Tax Court Rules of Practice and Procedure; Marcello v. Commissioner,380 F.2d 499, 505-507 (5th Cir. 1967), affg. 43 T.C. 168 (1964). Petitioners, however, presented no arguments or evidence relating thereto. We sustain respondent's determination of the section 6651(a)(1) addition to tax. Decisions will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as in effect during the year in issue. ↩
2. Respondent also determined a deficiency in Federal income tax for 1980 against the Estate of Norma Merryman. The Estate of Norma Merryman has not filed a petition with this Court for redetermination of that deficiency. ↩
3. These amounts apparently were not available for distribution until early 1982, after all accrued gross receipts were collected. ↩
*. Southland's fiscal year ends on March 31.↩