JACQUE F. LOSMANN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Losmann v. Commissioner
Docket No. 9420-86
United States Tax Court
T.C. Memo 1990-149; 1990 Tax Ct. Memo LEXIS 173; 59 T.C.M. (CCH) 172; T.C.M. (RIA) 90149; March 20, 1990
Robert A. Housman, (specially recognized) for the petitioner. Robert S. Scarbrough, for the respondent. SCOTT *320 MEMORANDUM OPINION SCOTT, Judge: This case was assigned to Special Trial Judge Lee M. Galloway pursuant to section 7443A(b)(4) of the Internal Revenue Code of 1986 and Rule 180 et seq. [1] The Court agrees with and *175 adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE GALLOWAY, Special Trial Judge: Respondent determined the following deficiency in and additions to petitioner's 1982 Federal income tax: Additions To Tax, Secs:
Year
Deficiency
6653(a)(1)
6653(a)(2)
6659
1982
$ 25,261
$ 411.30
*
$ 6,764 ** Respondent also determined that petitioner is liable for additional interest under section 6621(d), redesignated as section 6621(c). This case is a test case for investors who were denied deductions for losses relating to their investments in the Successful TV Shows partnerships. The issues for decision are: (1) whether petitioner has established that Successful TV Shows (STVS) partnership losses of $ 56,000 claimed on his 1982 *176 return resulted from production costs which were "paid" or "incurred" by STVS during the taxable year; (2) whether petitioner's transactions in 1982 with respect to STVS partnerships were transactions lacking economic substance; (3) whether petitioner is entitled to use income averaging in computing his 1982 tax liability; (4) whether petitioner is liable for additions to tax under sections 6653(a)(1) and (2) for negligence or disregard of rules or regulations; and (5) whether petitioner is liable for additional interest with respect to tax motivated transactions under section 6621(c). Some of the facts are stipulated and are so found. This reference incorporates the stipulation of facts and the attached exhibits. Our findings of fact and opinion are combined for the purposes of clarity and convenience. Petitioner was a resident of Pacific Palisades, California, when his petition was filed with this Court. He filed a timely Federal income tax return for 1982 with the Internal Revenue Service Center, Fresno, California. *321 (1) Payment of Production Costs
The principal issue to be decided is whether respondent correctly denied petitioner STVS partnership losses on the ground *177 that alleged production costs attributable to these partnership losses were not "paid" or "incurred" during the year 1982. a. Background
At the time of trial, petitioner had been employed for 14 years by A&M Records (A&M) as Vice-President of its International Division. Petitioner is responsible for, among other things, marketing, promotion, touring, and release of records. A&M is the world's largest independent record company. It is located in the Los Angeles area and has a wholly-owned studio publishing company, and several other separate companies in the United States as well as in London, England, and Toronto, Canada. Petitioner is particularly involved in the international business operations of A&M. He travels extensively in various parts of the world and represents the company with respect to negotiating foreign licensing agreements. Petitioner graduated from Brigham Young University in about 1965, with an MBA in Business Administration Communication. Petitioner's 1982 tax return was prepared by Jack Elliott, a Los Angeles area tax preparer/tax consultant. At the time of trial, Jack Elliott had been a tax preparer for about 30 years. Jack Elliott had been *178 acquainted with petitioner and had prepared his tax returns for about 20 years. Jack Elliott's business address, as disclosed on petitioner's return, was Elliott & Associates, 4800 S. Sepulveda Blvd., Culver City (hereinafter sometimes called the Culver City address), a suburb of Los Angeles. Jack Elliott was also an organizer and promoter of tax shelters. The shelter vehicle used for claiming tax losses was a limited partnership. Each limited partnership had the name Successful T.V. Shows (STVS) and a separate partnership number. Jack Elliott was the general partner of each STVS limited partnership. During 1982, approximately 261 limited partners claimed tax losses on their returns from their purported investment in STVS partnerships. The partnerships were organized and promoted by Jack Elliott for the alleged purpose of making TV pilot films and thereafter TV series. Production costs of the STVS limited partnerships were claimed for production of the following titled TV pilots: (1) Magic-Magic, (2) What Has Four Wheels And Flies, (3) Trails To Adventure, (4) Women-speak, (5) Crack-Ups, and (6) Family Forum. Some time during 1982, Jack Elliott and petitioner discussed the possibility *179 of a limited partnership investment by petitioner in a television series production. Jack Elliott advised petitioner of the six television series currently being produced or scheduled for production. Petitioner testified that he was primarily interested in investing in a television series in order to make a profit, in part because he "wanted to buy a house." However, petitioner was aware that "there (were) some tax advantages" if he made an investment in a television (TV) series. In fact, tax benefits were the sole purpose behind petitioner's purported investment. Petitioner and Jack Elliott agreed that the investment best able to serve petitioner's needs was the TV series currently being produced called "Magic-Magic." b. Petitioner's Investment In STVS Partnerships
On November 18, 1982, petitioner and Jack Elliott entered into three nearly identical agreements relating to limited partnerships STVS-82 #436, STVS-82 #437 and STVS-82 #438. The provisions of these agreements were the following: LIMITED PARTNERSHIP AGREEMENT THIS AGREEMENT, entered into the 18th day of November, 1982, by Jack Elliott, General partner, hereinafter referred to as the PRODUCER, and *180 Jacque F. Losmann hereinafter referred to as the LIMITED PARTNER. WHEREAS, the LIMITED PARTNER desires the PRODUCER to produce pilots and/or documentaries for television distribution and the PRODUCER hereby agrees to perform such production, the parties enter into this LIMITED PARTNERSHIP AGREEMENT subject to the following terms and conditions: ARTICLE 1. The name of the Partnership shall be STVS 82 #436, provided, however, the PRODUCER may, in his sole discretion, change the name of the Partnership at any time and from time to time. ARTICLE 2. The principal place of business of the Partnership shall be 1618 Seabright Ave., Suite 28, Santa Cruz, California, 95062, but such location may be changed to another place within the State of California as the PRODUCER may, from time to time, designate by written notice to the LIMITED PARTNER not less than (10) days preceding such change. *322 ARTICLE 3. The Partnership shall commence upon the signing of this AGREEMENT and shall continue for a period of ten (10) years thereafter unless terminated sooner by agreement of the parties. ARTICLE 4. The LIMITED PARTNER agrees to pay with a cashier's check the PRODUCER the sum of *181 $ 20,000.00 upon the signing of this AGREEMENT. ARTICLE 5. The LIMITED PARTNER shall receive 100% of all net profits until the initial cash investment of $ 20,000.00 has been repaid. After this initial investment of $ 20,000.00 has been repaid, any and all net proceeds will be divided equally between the LIMITED PARTNER and the PRODUCER. ARTICLE 6. The LIMITED PARTNER shall be held free and clear from all liabilities in excess of the initial investment of $ 20,000.00 and the PRODUCER shall be responsible for all costs and liabilities in excess of $ 20,000.00. ARTICLE 7. The LIMITED PARTNER shall not withdraw any or all of his initial investment of $ 20,000.00 without the consent of the PRODUCER, nor shall the LIMITED PARTNER have the right to cause partition of any real property owned by the Partnership until dissolution of the Partnership. * * * ARTICLE 11. The LIMITED PARTNER shall not participate in the control of the business or affairs of the Partnership nor transact any business on behalf of or in the name of the Partnership, provided however, nothing herein contained shall be construed to limit the right of the LIMITED PARTNER upon demand to receive full and *182 true information at all reasonable times concerning all things affecting the Partnership or any other rights conferred on him as a LIMITED PARTNER. ARTICLE 12. The PRODUCER shall have total discretionary rights and authority to conduct the business and shall have the full and complete charge of all the affairs of the Partnership, including expenditure of all funds and execution of any deeds, conveyances, agreements, certificates and all other documents affecting the business of the Partnership. * * * * * * S/Jacque F. Losmann LIMITED PARTNER S/Jack Elliott PRODUCER-GENERAL PARTNER The provisions in the second and third limited partnerships were the same as in partnership STVS #436 with the exception of the following changes: (1) the partnership name change and, (2) petitioner's "initial cash investment" disclosed in partnership articles 4,5,6 and 7 of STVS-82 #438 was $ 16,000 instead of $ 20,000. The three partnership agreements were typed on a form with "SUCCESSFUL T.V. SHOWS" printed at the top. Petitioner did not pay Jack Elliott the amounts required to be paid in cash upon execution of each agreement, which total $ 56,000. On December 1, 1982, petitioner *183 drew three checks payable to TV Ventures Financing in the amounts of $ 5,000, $ 5,000 and $ 4,000. Each check disclosed the name of one of petitioner's STVS limited partnerships. The checks were drawn on petitioner's Security Pacific National Bank account located at Sunset and Stanley, Los Angeles, and were deposited on December 20, 1982, in Century Bank account (number X-XX401-0), Culver City, California (Century account), of TV Ventures Financing. Some time between December 20, 1982 and December 22, 1982, the sums deposited by petitioner in the Century account were transferred to the account of TV Ventures Financing in Security Pacific National Bank, Los Angeles Westchester branch, (SPNB #1). TV Ventures Financing had the same business address as Jack Elliott's business, 4800 S. Sepulveda Blvd., Culver City. On December 1, 1982, petitioner executed three nearly identical assignments. These documents read as follows: Assignment
General Partner, Successful TV Shows 1618 Seabright Ave., Suite 28 Santa Cruz, CA
Dear Sir: You are hereby authorized to transfer all of my/our shares of the distributed net profits from the Successful TV Shows STVS-82 *184 #436 for repayment of monies advanced by TV Ventures until such time as a total of $ 15,000.00 plus simple interest accruing at an annual rate of 12% from the date of November 18, 1982 has been paid in full. It is understood by the undersigned that the proceeds gained form Article 5 of the Limited Partnership Agreement concerning said *323 STVS-82 will be used to repay the above advance from TV Ventures Financing. Upon completion of this payment, I will directly receive the subsequent net profits, which, in accordance with Article 5 of the Limited Partnership Agreement, will then return $ 5,000.00. Then in accordance with Article 5 of said Agreement, the subsequent profits will be shared 50% with the General Partner. S/ Jacque F. Losmann Date: December 1, 1982 The assignment documents were the same except as to partnership name change and insertion of the respective amounts of $ 12,000 and $ 4,000, in STVS-82 #438 in place of $ 15,000 and $ 5,000. On December 17, 1982, Jack Elliott, for TV Ventures Financing, executed three nearly identical documents to which were attached three nearly identical promissory notes. These documents read as follows: Jacque Losmann
12/17/82
Date
*185 This is to acknowledge receipt of $ 5,000.00 (Five Thousand Dollars) towards an investment in the Successful TV Shows 1982 Limited Partnership number STVS-82 #436. To the above amount we will be lending you an additional $ 15,000.00 (Fifteen Thousand Dollars.) Upon signing an eight year recourse note we will issue a cashiers check in your name in the amount of $ 20,000.00 (Twenty Thousand Dollars) made payable to Successful T.V. Shows identified as S.T.V.S. S/Jack Elliott PROMISSORY NOTE
$ 15,000
DATE: November 18, 1982
For Value received, the undersigned (Maker) promises to pay to the order of TV Ventures Financing (Holder) the principal sum of $ 15,000.00 together with simple interest at the rate of 12% (twelve percent) per annum on the unpaid balance. The undersigned agrees that the above loan is for the purpose of making an investment as a Limited partner in a film project entitled SUCCESSFUL TV SHOWS (STVS) 82-#436.
This note may be prepaid in whole or in part, without penalty. The Maker agrees to authorize the General Partner for the SUCCESSFUL TV SHOWS PROJECT STVS 82 to transfer *186 the Maker's share of the distributed net profits from said PROJECT to HOLDER until the entire note plus interest is paid in its entirety. The Maker hereby waives presentation, demand of payment, notice of dishonor, protest, notice of protest and any and all other notices and demands in connection with this note. S/Jacque F. Losmann These receipts and promissory notes were the same except as to name change and insertion of the amounts of $ 4,000, $ 12,000 and $ 16,000 in STVS 82-#438 in place of $ 5,000, $ 15,000 and $ 20,000. Cashier's checks were issued on December 22, 1982, from SPNB #1 in the respective amounts of $ 20,000, $ 20,000 and $ 16,000 and deposited in the account of Successful TV Shows (STVS) located at the same Security Pacific National Bank, Westchester Branch, (SPNB #2). The STVS account also had the same address as Jack Elliott's business, 4800 S. Sepulveda Blvd., Culver City. c. Preparation and Examination Of Petitioner's Tax Return
On his 1982 tax return, petitioner's partnership loss deduction was claimed from the STVS partnerships as follows: STVS-82-436
$ 20,000
STVS-82-437
20,000
STVS-82-438
16,000
Total Loss Claimed
$ 56,000
*187 Forms 1065 (U.S. Partnership Return of Income) were prepared for each of the above partnerships. Each partnership return contained the same information with the exception of the smaller loss claimed on Form 1065 for STVS-82-438. The three returns each reflected: (1) the partnership return address as 1618 Seabright Ave., #28, Santa Cruz, California 95062; (2) the principal partnership business activity to be "TV PRODUCTION"; (3) the principal partnership product or service to be "FILMS"; (4) the partnership used the cash method of accounting; (5) partnership gross income was zero; (6) each partnership loss resulted from a deduction for "PRODUCTION COSTS"; (7) the date partnership business commenced was April 1, 1982; (8) each partnership had been actively operated for eight months as of February 3, 1983, the date the partnership returns were prepared; and (9) each partnership was a limited partnership with two partners. The returns each included a Schedule K-1 (Partner's Share of Income, Credits, Deductions, etc.), which disclosed that petitioner's claimed partnership loss had offset an equal amount of capital contributed during the year 1982, leaving a zero capital account at the *188 end of the year. Each *324 partnership return was signed by Jack Elliott as general partner. Petitioner's 1982 tax return and the three 1982 STVS partnership returns were examined in 1984 by a revenue agent of the Internal Revenue Service with 15 years' experience. In 1984, the agent was examining primarily tax shelter returns, both partnership and individual, including many STVS partnership returns prepared by Jack Elliott. The agent contacted Jack Elliott and requested substantiation of the $ 56,000 production costs claimed on petitioner's three partnership returns. Jack Elliott provided photocopies of bank cashier's checks, but no books and records, claiming that the books and records were in Curacao, Netherlands Antilles, and unavailable to him. (However, at trial, Jack Elliott testified that the STVS partnership records had been lost after he gave them to an alleged co-producer, Andrzej Krakowski after Jack Elliott departed from Culver City following the 1982 tax season to live in Santa Cruz, California. According to Jack Elliott, he attempted to secure the STVS partnership records from Krakowski in Los Angeles in response to the agent's request and was told by Krakowski "all *189 I can tell you is that I do know we did a lot of (house) cleaning, and apparently, they (got) thrown out.") The agent sent Jack Elliott a certified letter document request under section 982(c)(1) (Admissibility Of Documentation Maintained In Foreign Countries). Thereafter, the agent received additional cashiers checks and budget forecasts of production costs for Magic-Magic and the other five TV pilot productions. The budget forecast of production costs for Magic-Magic was $ 4,160,000. The agent also received the limited partnership agreements, assignments, promissory notes and other agreements relating to petitioner's purported investment in the three STVS partnerships. d. The Circling of Funds
As previously stated, Jack Elliott responded to the agent's request for the STVS partnership records with the claim that the records were either lost or in a foreign country. However, Jack Elliott did furnish the agent with copies of petitioner's three checks paid to TV Ventures Financing totaling $ 14,000 and checks from some of the other STVS limited partnership investors, all of which had been deposited in the Century bank account. (The agent had been assigned to examine approximately *190 360 partnership returns involving STVS investors). The agent secured copies of the Century bank account by summons, which included numerous checks in large amounts payable to Security Pacific National Bank, Los Angeles Westchester Branch. All of the checks were signed by Maxine Elliott, Jack Elliott's wife. The checks were deposited to account # XXX-XX8-480, the previously mentioned Security Pacific National Bank account of TV Ventures Financing (SPNB account #1). The agent discovered two related accounts at the same Security Pacific National Bank branch. The first account was the previously mentioned Security Pacific National Bank account #XXX-XX0-963 (SPNB account #2) in the name of Successful TV shows. The bank account application cards for TV Ventures Financing (SPNB #1) and Successful TV Shows (SPNB #2) disclose that (1) the bank accounts were both opened on December 2, 1982, (2) the authorized signers on the accounts were Jack Elliott and Maxine Elliott, (3) the accounts disclosed the business address of Jack Elliott in Culver City, [2] and (4) the business phone number was the same as Jack Elliott's telephone number. The types of business reported for TV Ventures Financing *191 and Successful TV Shows were "Funding-Trust" and "TV" respectively. The second related account was Security Pacific National Bank account # XXX-XX1-200 (SPNB #3) with the name and address of Telefilm, N.V., Abraham De Veerstraat 6, Curacao, Netherlands Antilles. This account was also opened on December 2, 1982. Respondent argues that petitioner's claimed losses due to production cost losses allegedly derived from STVS partnerships are not deductible because petitioner has failed to establish that the claimed costs were "paid" or "incurred" during 1982 by petitioner, *192 the STVS partnerships, or anyone. Petitioner and the STVS partnerships are on the cash basis of accounting. A cash basis taxpayer may only deduct expenses in the year paid. Section 1.461-1(a)(1), Income Tax Regs; Helvering v. Price, 309 U.S. 409, 413 (1940). The burden of establishing the right to a claimed deduction is on the taxpayer. Interstate Transit Lines v. Commissioner, 319 U.S. 590, 593 (1943); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); Welch v. Helvering, 290 U.S. 111, 115 (1933); Rule 142. As stated above, Jack Elliott did not provide the agent with the STVS records or any documentary evidence which would support payment *325 of production costs of Magic-Magic or any other TV pilot documentaries. Respondent claims that petitioner's checks totaling $ 14,000, and the funds of many other STVS investors were originally deposited in the Century account and then transferred to SPNB #1. These funds, including petitioner's purported "loans" totaling $ 42,000 in the form *193 of cashier's checks issued from SPNB #1, were then transferred to SPNB #2, SPNB #3 and back to SPNB #1, thereby creating a circular paper trail of over approximately seven million dollars in nonexistent production costs from December 8, 1982, until December 30, 1982. According to Jack Elliott, the general partner of all STVS partnerships, all STVS investors' funds, including petitioner's, either went directly into the TV Ventures Financing Century bank account for convenience purposes until the account reached a certain level, or the investor's funds were allegedly deposited directly into TV Ventures Financing SPNB account #1. In SPNB account #1, the STVS investors' cash contributions were to unite with loans from foreign investors. (Jack Elliott told the agent that the foreign investors "were a group of wealthy barons over in Germany that were interested in providing capital for the purpose of * * * investing in these movies, since the investors, the taxpayers did not have enough funds themselves. They were going to provide 75 percent of the capital * * *."). The account summaries from the Century account and SPNB account #1 show the exact amount of funds that moved between *194 these two accounts from December 2, 1982 through December 22, 1982. However, despite petitioner's contention to the contrary at trial and on brief, there is no evidence showing (1) that any of these funds (including petitioner's three checks for $ 14,000) were used to pay for STVS production costs in 1982 and (2) that petitioner's $ 42,000 "loans" or any other "loans" were the result of deposits made independently by TV Ventures Financing or any other entity. Indeed, we agree with respondent that the evidence discloses no funds from the sources alleged were used to pay production costs and that the alleged "loans" were only a fiction created by circling funds from SPNB account #1, to SPNB account #2, to SPNB account #3, and back to SPNB #1, all of which were at the same branch of Security Pacific National Bank. For example, on December 8, 1982, $ 482,000 was available for use in SPNB account #1. These funds were available due to four deposits from the Century account totaling $ 482,000 as follows: December 2, 1982 ($ 392,000), December 3, 1982 ($ 11,000), December 7, 1982 ($ 43,000), and December 8, 1982 ($ 36,000). The first disbursement from SPNB account #1 occurred on December 8, 1982, when *195 twenty cashier's checks were purchased totaling $ 384,000. Logically, the balance in SPNB account #1 at the close of business December 8, 1982, should have been $ 98,000 ($ 482,000 available less $ 384,000 disbursement for purchase of cashiers checks). The balance at the close of business on December 8, 1982, was, however, $ 482,000. The $ 384,000 in cashier's checks purchased on December 8, 1982 were made payable to STVS and deposited on that same day into the STVS account titled Successful TV Shows (SPNB account #2). Also on December 8, 1982, the $ 384,000 deposited into SPNB account #2 was electronically transferred to the account in the name of Telefilm (SPNB account #3). Finally, to complete the circle, the $ 384,000 transferred into SPNB account #3 was electronically transferred back into SPNB account #1. All the transfers occurred on the same day. Therefore, there were effectively no expenditures in any account, only a paper trail of $ 384,000. As stated above, the balance in SPNB account #1 for December 8, 1982, remained at $ 482,000. It appears that what happened on December 8, 1982 occurred seventeen additional times between December 9, 1982 and December 30, 1982. *196 The circling of funds in these accounts was made possible by the fact that the only authorized signatories on these four accounts were Jack Elliott and his wife, Maxine. Our review of these records discloses that the cashier's checks on the Century bank account were all written by Maxine Elliott. Mrs. Elliott did not testify at trial. Moreover, the statements, checks and transfers relating to these three SPNB accounts show that there was no other movement of funds between the accounts in December 1982 other than for circling, i.e., there was no evidence of funds used for payment of production or other TV pilot costs to producers, directors, actors or anyone else. Also, since there were no funds moving through these accounts other than the circled funds, it dispels petitioner's assertion that there were "loans" from an outside source being deposited into SPNB account #1, as claimed. It is well established that for tax purposes the substance of a transaction controls over its form. Gregory v. Helvering, 293 U.S. 465, 469 (1935). This rule precludes the taxpayer from structuring *197 paper arrangements that do not stand on the solid foundation of economic reality. Zmuda v. Commissioner, 79 T.C. 714, 719 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). See also Erhard Seminars Training v. Commissioner, T.C. Memo. 1986-526. While the structure of the arrangements may reflect ingenuity and organization, "as a court, we *326 must not be beguiled by such ingenuity-we must pursue the 'paper chase' to ferret out the substance of the arrangements to determine the proper tax treatment." Estate of Helliwell v. Commissioner, 77 T.C. 964, 983 (1981). Petitioner, unable to furnish documentary evidence that he paid any of the alleged production costs claimed on the STVS partnership returns, nevertheless strenuously argues in his reply brief "the records demonstrate that during 1982 the STVS Partnership paid Telefilm $ 4,160,000.00 for the production of the 26 episodes of Magic-Magic." Petitioner's claim is based entirely on Jack Elliott's testimony and the limited partnership and other documents created by Jack Elliott. One such document is a Production-Service Agreement dated November 17, 1981, between Successful *198 TV Shows, Owner, a limited partnership (signed by its authorized officer Jack Elliott) with a principal place of business at 335 Via Linda Vista, Redondo Beach, California, and Telefilm, N.V., (Contractor), a corporation with its principal place of business at Abraham De Veerstraat 6, Curacao, Netherlands Antilles, (signed by its authorized officer Mr. Marian Pawlowski). The Production-Service Agreement provided that Owner agreed to employ Contractor "to produce twenty-six commercial half-hour TV pilots each presenting three acts of various internationally known magicians entitled 'Magic-Magic.'" The contract price was U.S. $ 4,160,000, "to be paid over to an authorized agent on or before December 31, 1982." Thus, according to this agreement, it cost $ 320,000 an hour to produce the Magic-Magic TV series. The agreement provided that the Contractor complete the TV pilots no later than December 1, 1982, and that the law governing the agreement and its provisions was that of Germany and the United States. There is no evidence that the TV series Magic-Magic was ever produced under the provisions of the Production-Service Agreement. However, there is independent evidence that Magic-Magic *199 was produced and completed. An agreement dated September 9, 1981 between Filmtel, Inc., using the Culver City address, and International Media Group, Inc. (IMG) of Las Vegas, Nevada, involved IMG's "plans to produce a television series of 26 half-hour episodes * * * (entitled Magic-Magic) featuring performing magicians for distribution on television and other media throughout the world" and Filmtel's desire "to invest in the production of the Series and to participate in the net distribution revenue world-wide * * *." The parties agreed to a production budget of $ 200,000. Filmtel was to invest $ 100,000 "into the production account" of IMG. A production credit paragraph provided that the videotapes "produced (by IMG) in association with FILMTEL, INC. * * * shall also bear the following: Executive Producers, Jack Elliott and Andrzej Krakowski." This agreement was signed by Michael Haller for IMG (Respondent's witness at trial) and Andrzej Krakowski. The September 9, 1981 agreement was superseded by a May 25, 1982, agreement (in which Michael Haller and Martin Cooper were named additional parties as well as IMG). IMG assigned to Filmtel "all rights, title and interest to the (Magic-Magic) *200 Series" for $ 13,000. IMG and Haller represented that "all materials in their possession" of the partially produced Magic-Magic series had been delivered to Filmtel. The Court's copy of this agreement was signed by Haller twice (as President of IMG and himself individually), by Cooper, but not by Filmtel. Producer Lynn Garrison, respondent's witness, had worked for IMG under the September 9, 1981 agreement. Garrison testified that he completed the production of Magic-Magic without compensation. Mr. Garrison was not assisted by Jack Elliott or Andrzej Krakowski, the co-producers named in the September 9, 1981 IMG agreement. The fact that production of the Magic-Magic TV series was completed is of no assistance to petitioner's claim that he paid Magic-Magic product costs through the STVS partnerships. There was no testimony or other evidence of 1982 Magic-Magic production costs incurred or paid as of the date of the Filmtel/IMG settlement agreement of May 25, 1982. Garrison estimated that the total cost of producing and completing the 26 half-hour episodes of Magic-Magic was $ 400,000, although the budgeted production costs totaled $ 336,000. Despite Garrison's estimate of *201 a more believable, although otherwise unverified, cost of producing Magic-Magic than the $ 4,160,000 cost claimed by petitioner, there is no independent evidence of any 1982 costs of producing Magic-Magic. Moreover, there is no evidence that any of the estimated production costs testified to by Lynn Garrison were in fact paid in 1982 by the STVS partnerships, including those allegedly paid by petitioner's checks totaling $ 14,000 deposited in the Century account and the $ 42,000 "loans" claimed to have been made to petitioner from TV Ventures and deposited in the STVS account. Garrison gave no testimony as to who paid the cost of producing Magic-Magic, what bank was used when the costs were paid, nor was he questioned on this point under either direct or cross examination. Petitioner has totally failed to show that any STVS partnership production costs were paid in 1982 as a result of his claimed investment in the partnerships. Respondent's disallowance of petitioner's claimed STVS partnership losses totaling $ 56,000 is sustained. (2) Transactions lacking economic substance
*327 In numerous tax shelter cases, this Court has reviewed complex sophisticated transactions entered *202 into by taxpayers and has held that the transactions lacked economic substance, and are therefore to be disregarded for tax purposes. See Rybak v. Commissioner, 91 T.C. 524 (1988); Cherin v. Commissioner, 89 T.C. 986 (1987); Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989). In many recent cases, these transactions have been described as "generic tax shelters" and are "analyzed under the objective test for economic substance set forth by the Court in Rose v. Commissioner, * * *." Rybak v. Commissioner, supra at 535. In Rose v. Commissioner, supra at 412, we stated in part: Review of those cases applying the "subjective test" (of section 183) shows common characteristics reminiscent of those in which the "objective test" (of economic substance) has been applied: (1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to *203 tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance. * * * The transactions in this case do not rise to the level of a generic tax shelter. Although tax benefits were the sole purpose of petitioner's purported investment, there were no written "promotional materials," no purchase of assets by investors, no assets to value and accordingly no overvaluation. (As noted previously, respondent has conceded the section 6659 addition to tax for valuation overstatement). Most of the consideration was deferred by promissory notes to ostensibly pay "production costs." The entire STVS shelter scheme was the brain child of tax preparer/shelter promoter Jack Elliott. We have found that use of the various bank accounts established by Jack Elliott and the STVS limited partnership agreements and other documents executed by petitioner and Jack Elliott did not support petitioner's claimed production costs deduction. The bank accounts created nothing more than a circling *204 of funds through several bank accounts, i.e., a "paper chase." This record disclosed that limited partnership agreements, assignments, promissory notes and other documents were sham and without economic substance. Our conclusion is supported by Jack Elliott's testimony and a detailed review of the various documents which he orchestrated as part of this STVS partnership scam. Jack Elliott was petitioner's sole witness. In general, his testimony was self-serving, contradictory, repetitious, garrulous, and many times incredible to the extent that no superlative can define it. We accorded little weight to Jack Elliott's testimony, especially when it conflicted with the testimony of other witnesses at trial. Jack Elliott, as the STVS tax shelter promoter, used many titles. On November 17, 1981, he was the "authorized officer" of Successful TV Shows, located in Redondo Beach, California, (the Redondo Beach address) the "Owner" with whom the "Contractor" (producer) in the Netherlands Antilles agreed to produce 26 half-hour TV pilots known as Magic-Magic for a contract price of $ 4,160,000. It appears that Jack Elliott was also Telefilm N.V., the alleged "Contractor" (producer), the *205 named account holder of SPNB account #3, and the other party to the November 17, 1981 agreement. The fact that the Production-Service Agreement was signed by an unidentified Marian Pawlowski for Telefilm, N.V., means nothing. The credible evidence in this record disclosed that production of the Magic-Magic series was accomplished under the terms of the previously mentioned IMG agreements. On November 18, 1982, Jack Elliott was the "Producer-General Partner," in three STVS partnerships with petitioner, of pilots or documentaries for television, for which he was to be paid $ 60,000 by petitioner ($ 20,000 from each partnership) by cashier's checks when the partnership agreements were signed. These amounts were never paid. At trial, petitioner claimed to be a limited partner pursuant to the three STVS limited partnerships. Under California law, petitioner would not qualify as a limited partner. See sec. 1.761-1(c), Income Tax Regs.Section 15502, California Corporate Code (West 1977), provides that two or more persons desiring to form a limited partnership must: *206 (a) Sign and acknowledge a certificate * * * and (b) Record said certificate in the office of the recorder of the county in which the principal place of business of the partnership was situated. No certificate was recorded in Santa Cruz County, the business address given for the limited partnerships. In the absence of substantial compliance with the provisions of Corporations Code section 15502, a general partnership is formed and all partners will be treated as general partners. See Security Pacific Nat. Bank v. Matek, 175 Cal. App.3d 1011; 223 Cal. Rptr. *328 288, 291 (1985); Brown v. Parish, 99 Cal. App.3d 301, 429; 160 Cal. Rptr. 282 (1979). An investment in a TV series or movie contemplates some plan for distribution of the film. Petitioner introduced in evidence a Distribution Agreement dated January 5, 1983, between Successful TV Shows (signed by Jack Elliott as producer) with the STVS principal place of business at the same Redondo Beach address used by Jack Elliott for the STVS partnerships in the November 17, 1981, Production-Service Agreement and Filmtel, (Distributor), using the same Culver City address of *207 Jack Elliott (signed by Art Jacobs). The Distribution Agreement provided that Filmtel was given the "sole, exclusive and irrevocable license" by STVS (producer Jack Elliott) to distribute 26 episodes of Magic-Magic throughout the world. The license given to the distributor was for a term of one year, "automatically renewed thereafter from year to year." It appears that Jack Elliott, the "producer" of the entity Successful TV Shows in the January 5, 1983, Distribution Agreement was also the "distributor" in the same agreement. STVS (Jack Elliott) had the Redondo Beach address in the Production-Service agreement of November 7, 1981 and the Distribution Agreement of January 5, 1983, but its bank account address was Jack Elliott's Culver City address. Telefilm NV and Filmtel Distribution or Filmtel, Inc. or Filmtel were apparently the same fictitious entities. At times in his testimony, Jack Elliott used the names "Telefilm" and "Filmtel" interchangeably. Art Jacobs was not at the trial. He was identified by Jack Elliott as the person who "headed Filmtel Distribution." When asked if the Magic-Magic series had been distributed pursuant to the Distribution Agreement, Jack Elliott *208 replied that distribution was prevented "when the IRS began their investigation in 1984, * * * there was a fear that the IRS would come in and attach, and in the industry, they just don't want to have any part of the possibility of a government lien of an attachment being put on it, because the cost that's involved in distribution many times, is so great." Prior to the IRS investigation and "threat" of a government lien, Jack Elliott was asked "were there any sales of the Magic-Magic series? Was there any gross income created as a result of the distribution of the product?" He replied "there were sales made to Japan and I believe to Singapore, and I don't remember the amount, but I think it was over a hundred thousand dollars." Jack Elliott's testimony was contradicted by producer Lynn Garrison, who stated "We never did get to distribute the film." We believe Garrison. To summarize, we believe the confusing and inconsistent array of documents in this record attributable to Jack Elliott, such as the limited partnership agreement, assignments and promissory notes, the SPNC bank accounts, the Production-Service Agreement and the Distribution Agreement, were all created by or for Jack *209 Elliott to attempt to justify substantial fictitious partnership deductions claimed by Jack Elliott on the returns of petitioner and other shelter investors. All of these transactions were sham or fraudulent transactions without economic substance. (3) Income Averaging
Respondent's notice of deficiency increased petitioner's reported 1982 tax liability of $ 2,000 to $ 27,261. The issue of whether petitioner can use income averaging in computing his 1982 income tax was not raised by petitioner in the petition or during trial of the case. Petitioner first addressed this issue in his post trial reply brief, stating in part "petitioner believes that he could use income averaging during the year at issue, (and) reserves the right to do a proper tax calculation, if needed, when this case is decided." This Court has frequently held that new issues raised for the first time on brief will not be considered. Philbrick v. Commissioner, 27 T.C. 346, 353 (1956). However, the income averaging issue raised by petitioner has been held to be procedural rather than substantive by the Court of Appeals for the Ninth Circuit, assuming that a taxpayer has retained true copies *210 of the prior tax returns necessary to calculate tax liability under the income tax averaging provisions of the law pursuant to Rule 155. Kelley v. Commissioner, 877 F.2d 756, 760 n.3, 760-761 (9th Cir. 1989), (quoting Combs v. United States, 490 F. Supp. 19, 20 (E.D. Ky. 1978), affd. on this issue 655 F.2d 90, 92 (6th Cir. 1981)), revg. T.C. Memo. 1986-405. We therefore consider it appropriate to decide whether decision should be entered under Rule 155 since respondent has otherwise prevailed on the substantive issues (including additions to tax as discussed below) except as to the additions to tax under section 6659, now conceded by respondent. We have previously held that an election made at trial to compute tax by income averaging is timely. Hosking v. Commissioner, 62 T.C. 635, 642 (1974). By way of contrast, this Court has rejected a taxpayer's attempt to elect income averaging after the trial and the entry of decision. See Pereira v. Commissioner, T.C. Memo. 1976-66. Here, petitioner *211 requested the use of income averaging, in computing his 1982 tax liability, "if needed," after trial but before the record was closed and decision was entered. The Ninth Circuit is the court to which an appeal lies in this case. See Golsen v. Commissioner, *329 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). In Kelley v. Commissioner, supra, the Ninth Circuit held that this Court, after a trial on stipulated facts, abused its discretion by refusing to allow an amendment of the taxpayer's petition to raise the issue of income averaging at the time the taxpayers submitted a Rule 155 computation and first raised the income tax averaging issue. This case was tried and the parties filed their briefs prior to the issuance of the Kelley opinion by the Ninth Circuit. To give the parties the opportunity to state their positions on the Kelley case and its applicability, if any, to the proper computation of petitioner's tax liability, we will enter decision under the provisions of Rule 155. (4) Additions to tax - Section 6653(a)
*212 Section 6653(a)(1)provides for an addition to tax if any part of an underpayment is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) provides for an addition to tax in the amount of 50 percent of the interest due on the portion of the underpayment attributable to negligence. Petitioner has the burden of proving that respondent's determination is incorrect. Bixby v. Commissioner, 58 T.C. 757, 791 (1972); Rule 142(a). Petitioner has failed to offer persuasive evidence to refute respondent's determination. We sustain respondent. (5) Additional Interest - Section 6621(c)
Respondent determined in his notice of deficiency that there is a substantial underpayment attributable to tax-motivated transactions for the taxable year 1982 relative to petitioner's investments in STVS. Section 6621(c) provides that in the case of a "substantial underpayment," (greater than $ 1,000) in any taxable year attributable to one or more tax-motivated transactions the rate of interest payable *213 thereon after December 31, 1984, shall be 120 percent of the rate established under this section. "Tax-motivated transactions" are those described in section 6621(c)(3)(A), including (v) any sham or fraudulent transaction. We have held that the partnership agreements, promissory notes, other agreements and bank accounts arranged in furtherance of the activities of the STVS limited partnerships were without economic substance. The transactions at issue were "sham" or "fraudulent" within the meaning of section 6621(c)(3)(A)(v). Accordingly, petitioner is liable for additional interest under section 6621(c). Smith v. Commissioner, 91 T.C. 733, 769 (1988); Cherin v. Commissioner, 89 T.C. 986, 1000 (1987). Decision will be entered under Rule 155. Footnotes
1. All subsequent section numbers refer to the Internal Revenue Code in effect for the taxable year in issue. All rule numbers refer to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on $ 25,261. ** In his opening brief, respondent conceded that petitioner is not liable for the addition to tax under section 6659.↩
2. We note that in the limited partnership agreement dated November 18, 1982, and the assignments dated December 1, 1982 from petitioner to Jack Elliott, the parties used the business address of the partnership and Jack Elliott as 1618 Seabright Ave., Suite 28, Santa Cruz, California, which is about 300 miles north of Jack Elliott's Culver City address. Jack Elliott also used the Santa Cruz address when preparing the STVS partnership returns on February 3, 1983. He testified that 1982 returns were the last returns prepared in Culver City and that in "December (1983), we actually moved to the Santa Cruz area."↩